Justice Brown delivered the opinion of the Court.
*650 In this case, we must determine whether the lessee of certain mineral interests justifiably relied on extra-contractual representations by the lessor's agent despite "red flags" and a negation-of-warranty clause in the sales documents explicitly placing the risk of title failure on the lessee. Because we hold, as a matter of law, that the lessee could not so justifiably rely, we reverse the court of appeals and reinstate the trial court's judgment in favor of the petitioners.
I
The Red Crest Trust owns about 40,000 acres of non-contiguous mineral interests throughout the Eagle Ford Shale. JPMorgan Chase Bank, N.A., acts as its trustee. Phillip Mettham, an employee of JPMorgan, was responsible for leasing the trust's Eagle Ford interests.
In 2010, Mettham leased fifteen of the trust's Eagle Ford tracts in DeWitt and Gonzales counties to GeoSouthern Energy Corporation. Comprising more than 1,800 acres, the GeoSouthern deal was one of the largest Mettham negotiated for the trust. Notably, GeoSouthern did not record its leases in the counties' property records until six months after closing the deal.
Also in 2010, Lawrence Berry, an experienced oil-and-gas businessman, formed Orca Assets, G.P., L.L.C. The specific purpose of establishing Orca was to acquire promising unleased acreage in the Eagle Ford Shale. And it quickly set its sights on the trust's holdings in Karnes and DeWitt counties. Orca's team included Berry; its vice president, John Ellis; landmen Tony Villalon and Joan Stewart, and a collection of additional landmen. All were experienced in leasing oil-and-gas properties.
On November 11, 2010, Mettham met with Ellis and Stewart to discuss Orca leasing some of the trust's tracts. Berry also attended part but not all of the meeting. Orca's team brought maps showing the tracts it desired to lease. Ellis asked Mettham whether the indicated acreage "was open and not leased." Each of Orca's representatives at the meeting remembered Mettham's reply somewhat differently. Ellis believes Mettham answered, "[Y]es, but I'll have to-I'll have to check." Stewart remembers him saying, "I'm not sure of that. I'll have to check." Berry recalls Mettham unequivocally representing that the acreage was "open," meaning unleased. However, Berry also concedes that he was in the meeting for only a brief time.
The trust requires that all leases of its tracts contain a clause negating any warranty of title. The standard lease form that JPMorgan usually uses when dealing with the trust's properties includes such a clause: "This Lease is made without warranties of any kind, either express or implied." Orca was familiar with that language as it had twice before leased acreage from the trust using the standard lease form.
But shortly after the parties' initial meeting, Mettham notified Orca that any lease deal it made with the trust would not employ the standard negation-of-warranty provision. Instead, JPMorgan would require new language expressly shifting the risk of title failure to the lessee. Mettham explained that the high volume of leasing activity in the region necessitated the change because lessees were quickly pursuing opportunities without thoroughly examining title. The new clause would read:
*651 Negation of Warranty. This lease is made without warranties of any kind, either express or implied, and without recourse against Lessor in the event of a failure of title, not even for the return of the bonus consideration paid for the granting of the lease or for any rental, royalty, shut-in payment, or any other payment now or hereafter made by Lessee to Lessor under the terms of this lease.
Mettham's request to include this new lengthier clause incited concerns among Orca's team. To Ellis, the provision "raised a red flag." It was a "curveball"-something he had never "seen before in any lease." Because the new warranty provision gave the lessee the responsibility "to make absolutely sure that [the t]rust owned the minerals," Ellis believed Orca should obtain "a solid outside legal opinion" as to title. And when asked if Orca would rely on JPMorgan "to confirm whether or not it had title to these mineral interests," Ellis responded: "We would never-that I would never look to JPMorgan to tell me whether or not [the t]rust owned the minerals that were in question."
Similarly, Villalon, Orca's landman and a former practicing attorney, conceded that without a warranty, Orca could purchase only "whatever it was that the Red Crest Trust had to sell," which "might be nothing at all." He also acknowledged that if the trust's properties had already been leased, it could not convey those minerals to Orca. In general, he did not find a disclaimer of warranty out of the ordinary. But he regarded the wording of this particular provision as unusually explicit. So he advised Ellis: "I think we need to accept the language, but we also need to give the title another review before we close."
On December 6, the parties signed a letter of intent acknowledging the trust's agreement to lease the tracts to Orca. In the letter, neither the trust nor JPMorgan made any representation about the trust's title or whether the acreage was available to lease. Instead, the letter provided that Orca had "caused a search to be made of the records of Karnes and DeWitt [c]ounties and has preliminarily determined that Red Crest Trust is the owner and holder of the mineral estate underlying" the tracts at issue.
The letter also quoted the new negation-of-warranty clause on which the parties had agreed. And the letter noted that Orca had requested and received a thirty-day option period in exchange for accepting the new language:
ORCA has accepted the counteroffer of RED CREST TRUST proposing to modify paragraph 18[,] ... but, in light of such requested modification to the lease form[, Orca] has requested, and RED CREST TRUST has agreed to, a delay of up to 30 calendar days in the closing of the proposed transaction to allow ORCA the opportunity to re-examine its title work upon which its determination of ownership is based ....
The letter further provided that the parties could close the transaction "on a piecemeal basis" over the thirty-day option period. As "the title to the individual tracts is examined and approved," the trust would execute a lease to that tract upon Orca tendering consideration of $3,500 per acre. And if Orca's "re-examination of title should reveal [previously unknown] information ... that brings into question the ownership" of one or more of the tracts, then Orca "may, in its sole and absolute discretion, elect to not take a lease on such tract or tracts." Finally, the letter precluded the trust or JPMorgan from leasing the tracts or granting an option to acquire a lease to any third parties.
Before signing the letter of intent, Orca had been checking the property records on an almost daily basis. But it did not continue *652 to do so during the thirty-day option period. And it was just three days into the option period, on December 9, that GeoSouthern finally recorded the leases it had obtained from the trust six months earlier. The tracts the letter of intent covered included much of the acreage GeoSouthern had already leased. Any title search Orca had commissioned after December 9-a search that one of Orca's landmen estimated would have cost between $600 and $800-would have revealed GeoSouthern's leases.
Orca contends it conducted no searches after signing the letter of intent because (1) its earlier searches had revealed no title issues, (2) Mettham had represented that the acreage was unleased, and (3) the letter precluded JPMorgan from leasing any of the tracts during the option period. The purpose of the thirty days, Orca argues, was to re-evaluate the title review it had already performed. Orca feared defects in title going backward in time, not forward.
Ultimately, Orca decided to move forward on just the tracts in DeWitt County-919 of the 1,680 acres covered in the letter of intent. On January 5, 2011, Orca sent Mettham six leases covering those tracts. Each lease contained the new negation-of-warranty language providing that it was "without warranties" and "without recourse" for failure of title. Six days later, Orca sent Stewart to close the deal. As Stewart handed Mettham bonus checks amounting to $3,217,585, she asked him again if he was "sure these are all open." A colleague attending the closing with Stewart interjected: "Well, they better be for that kind of money."
Mettham allegedly responded to Stewart by saying, "[L]et me check." Then, after he "looked at something below his desk," as well as "at his computer" and the maps Orca had provided, he said, "We're good to go. They're open." Orca recorded the leases in the DeWitt County property records the next day.
Two weeks later, GeoSouthern contacted Mettham. It had discovered Orca's leases in the property records-leases of acreage GeoSouthern had already leased. Mettham immediately informed Orca of the title defect. And on February 18, JPMorgan sent Orca a check refunding the $3.2 million in bonus payments, though it maintained it was not obligated to do so under the leases' negation-of-warranty provisions. But Orca rejected the tender. And on February 24, it sued JPMorgan and Mettham for $400,000,000 in lost profits.
II
Orca's causes of action against JPMorgan and Mettham included breach of contract, fraud, and negligent misrepresentation. Following a pre-trial conference, the trial court issued an order under Rule 166(g) disposing of all of Orca's claims. TEX. R. CIV. P. 166(g). It concluded that the unambiguous terms of the letter of intent and the leases precluded Orca's contract claim. And it ruled as a matter of law that Orca could not establish the justifiable-reliance element of its fraud and negligent-misrepresentation claims. The order amounted to a final judgment.
The court of appeals affirmed the trial court's contract ruling, but it reversed on fraud and negligent misrepresentation. 542 S.W.3d 591, ----, 2015 WL 4736786 (Tex. App.-Dallas 2015). The negation-of-warranty provision, the court opined, did not clearly and unequivocally disclaim reliance on prior representations. Id. at ----. For that reason, the court continued, the provision could not preclude justifiable reliance as a matter of law. Id. at 603 (relying on Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am. , 341 S.W.3d 323, 334-36 (Tex. 2011) ). Turning to JPMorgan's next argument, the court of appeals concluded *653 that the contractual provisions did not directly contradict the extra-contractual representations so as to preclude justifiable reliance as a matter of law. It based this decision on the clause's failure to explicitly refer to the existence, or lack thereof, of prior leases. And in its view, the clause's breadth hindered its ability to plainly correct and contradict the oral representations. This Court granted JPMorgan and Mettham's petition for review.
A
The trial court entered judgment against Orca following a pre-trial conference it convened under Rule 166. The purpose of such a conference is "to assist in the disposition of the case without undue expense or burden to the parties." TEX. R. CIV. P. 166. Subsection (g) of the rule provides that at the conference, the trial court may consider "[t]he identification of legal matters to be ruled on or decided by the court." TEX. R. CIV. P. 166(g).
Rule 166(g) authorizes trial courts to decide matters that, though ordinarily fact questions, have become questions of law because "reasonable minds cannot differ on the outcome." See Walden v. Affiliated Computer Servs., Inc. , 97 S.W.3d 303, 322 (Tex. App.-Houston [14th Dist.] 2003, pet. denied). When a Rule 166(g) order disposes of claims in this fashion, the order is akin to a summary judgment or directed verdict, and review is de novo. See id. at 324 (reviewing a Rule 166 order under the standard that applies to directed verdicts); McCreight v. City of Cleburne , 940 S.W.2d 285, 287 (Tex. App.-Waco 1997, writ denied) (equating a Rule 166 order with a partial summary judgment); see also City of Keller v. Wilson , 168 S.W.3d 802, 823 (Tex. 2005) (holding the legal sufficiency test is the same for summary judgments, directed verdicts, and appellate no-evidence review).
When reviewing for legal sufficiency, the "evidence is considered in the light most favorable to the nonmovant, crediting evidence a reasonable jury could credit and disregarding contrary evidence and inferences unless a reasonable jury could not." Merriman v. XTO Energy, Inc. , 407 S.W.3d 244, 248 (Tex. 2013). "Judgment without or against a jury verdict is proper at any course of the proceedings only when the law does not allow reasonable jurors to decide otherwise." City of Keller , 168 S.W.3d at 823.
B
Orca no longer presses its claim for breach of contract; only fraud and negligent misrepresentation remain. To prevail on a fraud claim, a plaintiff must show: (1) the defendant "made a material representation that was false"; (2) the defendant "knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth;" (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and suffered injury as a result. Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co. , 51 S.W.3d 573, 577 (Tex. 2001) (citing Trenholm v. Ratcliff , 646 S.W.2d 927, 930 (Tex. 1983) ). The fourth element has two requirements: the plaintiff must show that it actually relied on the defendant's representation and, also, that such reliance was justifiable. Grant Thornton LLP v. Prospect High Income Fund , 314 S.W.3d 913, 923 (Tex. 2010).
To prevail on a cause of action for negligent misrepresentation, a plaintiff must show: (1) a representation made by a defendant in the course of its business or in a transaction in which it has a pecuniary interest; (2) the representation conveyed " 'false information' for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence *654 in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation." Fed. Land Bank Ass'n of Tyler v. Sloane , 825 S.W.2d 439, 442 (Tex. 1992).
In this case, the representation upon which both fraud and negligent misrepresentation turn is Mettham's statement that the acreage Orca sought to lease was "open." He allegedly said so twice: once at the initial meeting in November 2010 and once at the closing in January 2011. The parties agree that "open" acreage is real property the lessor has not yet leased-an interest in land to which the lessor has good title and that is available to be leased.
JPMorgan and Mettham concede that Mettham made that representation and that it was false. (We will refer to the two defendants collectively as "JPMorgan" except when it becomes necessary to refer to Mettham separately.) Indeed, at this point, JPMorgan opposes just one essential element shared by Orca's two remaining causes of action: justifiable reliance. So our only question is this: Could Orca have justifiably relied on Mettham's representation concerning the availability of the tracts?
Justifiable reliance usually presents a question of fact. See Prize Energy Res., L.P. v. Cliff Hoskins, Inc. , 345 S.W.3d 537, 584 (Tex. App.-San Antonio 2011, pet. denied). But the element can be negated as a matter of law when circumstances exist under which reliance cannot be justified. See Nat'l Prop. Holdings, L.P. v. Westergren , 453 S.W.3d 419, 424 (Tex. 2015) (per curiam) ("We hold that, as a matter of law, th[e] reliance was not justifiable."); AKB Hendrick, LP v. Musgrave Enters., Inc. , 380 S.W.3d 221, 232 (Tex. App.-Dallas 2012, no pet.) (holding that reliance on a representation made in a business or commercial transaction can be unjustified as a matter of law).
In determining whether justifiable reliance is negated as a matter of law, courts "must consider the nature of the [parties'] relationship and the contract." AKB, 380 S.W.3d at 232. "In an arm's-length transaction[,] the defrauded party must exercise ordinary care for the protection of his own interests. ... [A] failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party." Westergren , 453 S.W.3d at 425 (quoting Thigpen v. Locke , 363 S.W.2d 247, 251 (Tex. 1962) ). And when a party fails to exercise such diligence, it is "charged with knowledge of all facts that would have been discovered by a reasonably prudent person similarly situated." See AKB , 380 S.W.3d at 232. To this end, that party "cannot blindly rely on a representation by a defendant where the plaintiff's knowledge, experience, and background warrant investigation into any representations before the plaintiff acts in reliance upon those representations." See Shafipour v. Rischon Dev. Corp. , No. 11-13-00212-CV, 2015 WL 3454219, at *8 (Tex. App.-Eastland May 29, 2015, pet. denied) (mem. op.).
JPMorgan argues that Orca could not establish justifiable reliance as a matter of law for two reasons: (1) Orca could not justifiably rely on Mettham's representations because his oral statements were directly contradicted by the parties' explicitly negotiated contractual provisions,[1] and *655 (2) "red flags" negated justifiable reliance by rendering it objectively unreasonable. We will begin our analysis with JPMorgan's "red flags" argument.
1
"Red flags "
In Grant Thornton, LLP v. Prospect High Income Fund , we held that "a person may not justifiably rely on a misrepresentation if 'there are "red flags" indicating such reliance is unwarranted.' " 314 S.W.3d at 923 (quoting Lewis v. Bank of Am. NA , 343 F.3d 540, 546 (5th Cir. 2003) ). In that case, investors claimed to have justifiably relied on certain representations when purchasing bonds from a corporation. Id. We held they could not have justifiably relied because before the acquisition, the investors' senior portfolio manager learned the corporation had lost its primary source of funding and was financially at risk. Id. Before reaching this conclusion, we noted that the portfolio manager was "an experienced bond investor" who held a finance degree and an MBA and who ultimately admitted the purchases "reflected a substantial risk." Id.
In adopting the "red flags" impediment to justifiable reliance in Grant Thornton , we were persuaded by the Fifth Circuit's decision in Lewis v. Bank of America NA, 343 F.3d at 540. The Fifth Circuit analyzed the justifiable-reliance element as follows:
Lewis, an individual with both a business background and familiarity with retirement accounts, should have viewed this series of events as a red flag warranting further investigation of the tax consequences of the loan transaction. Viewing the circumstances in their entirety, including Lewis's access to professional accountants, the amount of money involved in the transaction, and the ambiguous nature of [the defendant's] "assurance," Lewis's decision to enter into the transaction without undertaking additional investigation into its tax consequences was not justifiable.
Id. at 547 (footnote omitted).
JPMorgan argues the following "red flags" preclude Orca's justifiable reliance: (1) Mettham's statement that he "would have to check" whether the property was open for lease; (2) JPMorgan's insistence on the stricter negation-of-warranty provision; (3) JPMorgan's refusal to accept responsibility for verifying title; (4) the letter of intent itself; (5) Mettham's statement that other lessees were not doing careful title work; (6) Orca's knowledge that competitors might delay recording their leases; (7) Orca's knowledge that it ceased checking property records after signing the letter of intent; and (8) Orca's landman's "doubts" at the closing, manifested by her request that Mettham confirm once more whether the property was "open."
We are not prepared to say that any single one of these factors could preclude justifiable reliance on its own and as a matter of law. We especially reject the notion that the mere use of the negation-of-warranty and no-recourse provision in the letter of intent and the leases could *656 wholly negate justifiable reliance. Oil-and-gas leases, like other instruments of conveyance, often negate warranties of title. As the courts did in Grant Thornton and Lewis , we must instead view the circumstances in their entirety while accounting for the parties' relative levels of sophistication. We will explore the latter first.
JPMorgan concedes that it is a sophisticated business entity. And why wouldn't it? JPMorgan is one of the largest banks in the world. Donna Fuscaldo, The Largest Banks in the World , BANKRATE (Dec. 12, 2017), http://www.bankrate.com/finance/banking/largest-banks-in-the-world-1.aspx. The record also reflects that its employee, Mettham, was heavily experienced in oil-and-gas transactions. It was his responsibility to lease the trust's mineral assets, which spanned approximately 40,000 acres in the Eagle Ford alone. In 2010, Mettham executed between fifty and one hundred leases for the trust and other clients.
And though Orca was a newly founded company, its key players were also sophisticated oil-and-gas businesspeople. Berry and Ellis were both richly experienced in negotiating and acquiring oil-and-gas leases. Villalon had practiced law and worked as a landman for many years. And Orca had at its disposal a passel of other experienced landmen, including Stewart.
Both JPMorgan and Orca are sophisticated business entities, composed of knowledgeable, skilled, and experienced people who were more than capable of overseeing the negotiation and execution of the oil-and-gas deal at issue in this case. And the transaction at the heart of this case was no small deal. The six leases Orca ultimately received, after weeks of intense, detail-oriented negotiation, covered 919 acres and came at a cost of $3.2 million. Such world-savvy participants entering into a complicated, multi-million-dollar transaction should be expected to recognize "red flags" that the less experienced may overlook. See Grant Thornton , 314 S.W.3d at 923 (noting the justifiable reliance inquiry requires consideration of "whether, 'given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's part' " (alteration in original) (quoting Haralson v. E.F. Hutton Group, Inc. , 919 F.2d 1014, 1026 (5th Cir. 1990), overruled on other grounds as recognized in Lewis v. Fresne , 252 F.3d 352, 358 n.5 (5th Cir. 2001) ) ). We turn now to the "red flags" peculiar to this bargain.
"I'll have to check."
JPMorgan argues that Mettham's initial representation that the tracts were open to leasing was so ambiguous as to be undependable. Only one of the supposed witnesses to the November 2010 statement-Berry, who admits he was in and out of the meeting-testified that Mettham spoke in absolutes. He claims Mettham definitively stated the tracts were "open." But the other two witnesses to the statement concede the representation was equivocal. One testified that Mettham stated, "[Y]es, but I'll have to[ ] ... check." And the other indicated Mettham said, "I'm not sure of that. I'll have to check." Such equivocation should caution one against reliance. Cf. Lewis , 343 F.3d at 547 (noting one of the red flags precluding justifiable reliance was the "ambiguous nature" of the representations); Simpson v. Woodridge Props., L.L.C. , 153 S.W.3d 682, 684 (Tex. App.-Dallas 2004, no pet.) (affirming summary judgment where a fraud plaintiff could not rely on "vague references attributable to" the defendant when the contract specified the opposite and disclaimed reliance).
Stewart's "doubts" at the closing
Orca claims in its brief, and repeated at argument, that Mettham did check and *657 "later confirmed" the properties were available when he spoke with Stewart at the closing of the transaction. According to Stewart, Mettham's confirmation came as an answer to her last-minute, at-the-closing oral request for a verification that the tracts were "open." JPMorgan maintains that the fact that Stewart would even ask such a question, knowing that Orca had undertaken its own title examination, indicates that she and Orca harbored doubts as to title.
At that point, the parties had spent two months working toward executing the leases and closing the deal-including Orca's limited reexamination of title that it had requested and obtained extra time to conduct. Now it was turning over checks amounting to 3.2 million dollars. Particularly if it remained skeptical about the availability of the tracts, Orca could not "blindly rely" on JPMorgan's representations-both at the outset of the transaction and at its closing-when its knowledge, experience, and background called for further investigation. See Grant Thornton , 314 S.W.3d at 923 (measuring justifiable reliance based on a specific plaintiff's "individual characteristics, abilities, and appreciation of facts and circumstances"); Shafipour , 2015 WL 3454219, at *8 (stating a party "cannot blindly rely on a representation by a defendant where the plaintiff's knowledge, experience, and background warrant investigation into any representations before the plaintiff acts in reliance upon those representations"). A party must protect its own interests through the exercise of reasonable diligence, which "is not excused by mere confidence in the honesty and integrity of the other party." Westergren , 453 S.W.3d at 425.
The letter of intent
Mettham's statements at the initial meeting in November 2010 and at the closing in January 2011 were his only representations concerning who held title to the acreage. Orca describes the letter of intent as an implicit representation that the trust held good title to the tracts. But the letter's explicit terms show otherwise. The only indication in the letter that the trust holds title provides: "Orca has caused a search to be made of [the county] records ... and has preliminarily determined that [the trust] is the owner and holder of the mineral estate ...." JPMorgan made no assurance in the letter of intent that the trust had title. Orca would be paying millions to lease whatever the trust owned, which Villalon, its landman and a former practicing attorney, conceded could have been "nothing at all." And by the very terms of the letter, Orca had taken upon itself to verify exactly what the trust owned.
The new negation-of-warranty language
The letter of intent not only placed the onus on Orca to investigate title, it included a new, non-standard negation-of-warranty provision that expressly provided no recourse. One of Orca's landmen, Ellis, regarded the clause as a "curveball" that "raised a red flag"-something he had never "seen before in any lease." Because of the clause, Ellis advised Orca "to make absolutely sure that [the trust] owned the minerals" by obtaining "a solid outside legal opinion." He later stated: "We would never -that I would never look to JPMorgan to tell me whether or not [the trust] owned the minerals." (emphasis added). By Orca's team's own admissions, the negation of warranty itself amounts to a "red flag." See Grant Thornton , 314 S.W.3d at 923-24 (concluding that when an experienced senior portfolio manager recognized the "substantial risk" in acquiring certain bonds because of "red flags," the funds' "reliance would not have been justifiable").
Orca stopped checking the records
Leading up to the execution of the letter of intent, Orca had been regularly consulting *658 the county property records to check for newly filed leases. But it stopped once the letter of intent was signed. And three days after it stopped, GeoSouthern recorded its lease. According to Orca's landman's estimate, Orca could have discovered GeoSouthern's interest for a cost of just $600 to $800. Concededly, "Texas courts have never held that a purchaser's failure to search the deed records would bar his fraud action against the seller." Ojeda de Toca v. Wise , 748 S.W.2d 449, 451 (Tex. 1988). But that does not absolve a sophisticated business plaintiff of its duty to exercise ordinary care. See Westergren , 453 S.W.3d at 424-25 ("In an arm's-length transaction the defrauded party must exercise ordinary care for the protection of his own interests. ... [A] failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party." (alteration in original) (quoting Thigpen , 363 S.W.2d at 251 ) ); AKB , 380 S.W.3d at 232 (recognizing that when a party fails to exercise reasonable diligence and ordinary care to protect its own interest in an arm's-length transaction, it is "charged with knowledge of all facts that would have been discovered by a reasonably prudent person similarly situated").
2
Direct Contradiction
Throughout the course of this transaction, Orca encountered "red flags" that should have alerted it to the danger of blindly relying on JPMorgan's representations regarding title to the tracts. But another alarm Orca disregarded was the negation-of-warranty provision's direct contradiction of the representation upon which Orca claims to have relied. "[A]s Texas courts have repeatedly held, a party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous terms." Westergren , 453 S.W.3d at 424-25 (citing Thigpen , 363 S.W.2d at 251 ).
[A] party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of his own interests .... Therefore, reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law. ... If written contracts are to serve a purpose under the law, relative to oral agreements, it is to provide greater certainty regarding what the terms of the transaction are and that those terms will be binding, thereby lessening the potential for error, misfortune, and dispute. ... [A] party who enters into a written contract while relying on a contrary oral agreement does so at its peril ....
See DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A. , 112 S.W.3d 854, 858-59 (Tex. App.-Houston [14th Dist.] 2003, pet. denied).
In this case, the court of appeals held that for a contract to sufficiently contradict a representation such that reliance is rendered unjustifiable, the contract must "conflict with the earlier representation such that a reasonable person could not read the agreement and still plausibly claim to believe the earlier representation." 542 S.W.3d at 605. Because the letter of intent and the leases did not directly and specifically refer to the possibility of an earlier lease, the court of appeals continued, the instruments did not plainly correct Mettham's representation that the acreage was not already leased. Id. at ----. The court of appeals further concluded the provision did not unambiguously reassign to Orca the risk that the lands had already been leased. Id. at ----.
We do not quarrel with the standard the court of appeals employed to determine *659 whether the letter of intent directly contradicted Mettham's representation that the acreage was open: there is no direct contradiction if a reasonable person can read the writing and still plausibly claim to believe the earlier representation. But we also agree with JPMorgan that the court of appeals applied this standard incorrectly. In reaching its conclusion, the court of appeals held that for a contradiction to preclude justifiable reliance, both the contractual clause and the extra-contractual representation it supposedly contradicts must explicitly speak to the same subject matter with sufficient specificity to correct and contradict the prior oral representation. Such a requirement is simply too strict to be workable as it essentially requires the contract and extra-contractual representation to use precisely the same terms.
Courts have found direct contradiction even when the terminology appearing in the representation and the writing are not exactly the same. See, e.g. , Mikob Props., Inc. v. Joachim , 468 S.W.3d 587, 599 (Tex. App.-Dallas 2015, pet. denied) (holding a representation that a settlement agreement covered all parties was directly contradicted by the agreement explicitly listing some defendants while remaining silent about one, thus, barring the unlisted defendant from establishing justifiable reliance). For example, in Playboy Enterprises Inc. v. Editorial Caballero S.A. de C.V. , a company that Playboy magazine had licensed to distribute a Spanish-language version of the publication sued Playboy for breach of contract and various business torts, including fraud. 202 S.W.3d 250, 256-57 (Tex. App.-Corpus Christi 2006, pet. denied). One of the alleged representations was that "renewal" of the parties' license agreement would be automatic. Id. at 257. The court did not hesitate to acknowledge a direct contradiction since the contract stated the licensee would have the option "to request negotiations concerning an extension of the license" if the licensee was in full compliance with the agreement. See ids="8461816" index="51" url="https://cite.case.law/sw3d/202/250/#p256">id. at 258. Similarly, it held that saying it would not "be a problem to distribute or sell 150,000 copies per month" was "directly contradicted" by the agreement's provision that the number of copies the licensee would be allowed to distribute "will not exceed one-hundred-fifty thousand (150,000) per issue." See ids="8461816" index="52" url="https://cite.case.law/sw3d/202/250/#p256">id. at 257-58. Though the representations and contractual provisions did not involve precisely the same terms, the Playboy Enterprises court nevertheless held that the alleged misrepresentations the licensee complained of were "directly contradicted by the express, unambiguous terms of the License Agreement," precluding justifiable reliance as a matter of law. See ids="8461816" index="53" url="https://cite.case.law/sw3d/202/250/#p256">id.
The representation in this case is likewise directly contradicted by the language of the letter of intent and the parties' lease. As we discussed above, Mettham's representation that the acreage was "open" was essentially equivalent to stating the trust had not leased the property and, thus, had good title. And the parties' negation-of-warranty clause spoke to Orca's lack of recourse "for failure of title." Moreover, the warranties the clause negated were warranties of title. A warranty clause is "[a] provision in an oil-and-gas lease by which the lessor guarantees that title is without defect and agrees to defend it." Warranty Clause , BLACK'S LAW DICTIONARY (10th ed. 2014). It stands to reason that a negation-of-warranty clause is just the opposite: a provision in the lease by which the lessor disavows any "guarantee[ ] that title is without defect." For Orca to rely on Mettham's statement that the trust had title, it would have to ignore an express contractual provision explaining that JPMorgan and the trust make no guarantees pertaining to title.
*660 By their own testimony, the members of Orca's team acknowledged that the letter of intent left Orca responsible for verifying title to the tracts-and that Orca could obtain only whatever the trust had to convey. The sophisticated oil-and-gas businesspeople Orca employs understood the implications of the language in the letter of intent. They negotiated the letter's terms at arm's length-terms that assigned Orca the risk of a failure of title. It's true that the negation-of-warranty clause did not include the specific terms "leased," "open," or "unleased"-but it didn't need to. If Mettham's earlier representation amounts to a guarantee of title, as Orca contends, the negation of warranty was exactly the opposite. And as no reasonable, sophisticated entity could read the latter and plausibly believe the former, they are in direct contradiction. See Grant Thornton , 314 S.W.3d at 923 (defining the justifiable reliance inquiry as one that accounts for "whether, 'given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's part' " (alteration in original) (quoting Haralson , 919 F.2d at 1026 ) ).
* * *
Viewed in context with the numerous "red flags," Orca's sophistication in the oil-and-gas industry, and the direct contradiction between the representation and the letter of intent,[2] Orca cannot maintain its claim of justifiable reliance. Orca, composed of experienced and knowledgeable businesspeople, negotiated an arm's-length transaction and then placed millions of dollars in jeopardy-all while operating under circumstances that similarly situated parties would have regarded as imminently risky. Orca needed to protect its own interests through the exercise of ordinary care and reasonable diligence rather than blindly relying upon another party's vague assurances. Its failure to do so precludes its claim of justifiable reliance as a matter of law.
Justifiable reliance is an essential element of each of Orca's remaining causes of action. Because we have determined, as a matter of law, that it cannot show justifiable reliance, we reverse the court of appeals and reinstate the trial court's judgment for the petitioners.
Justice Blacklock did not participate in the decision.

Because the negation-of-warranty clause does not clearly and unequivocally disclaim reliance on prior representations, the court of appeals held the clause could not negate justifiable reliance as a matter of law. 542 S.W.3d at 604 (relying on Italian Cowboy , 341 S.W.3d at 334-36 ). In Italian Cowboy , we held that contracting parties can disclaim reliance, but only by "clear and unequivocal language." 341 S.W.3d at 336. We explained: "This elevated requirement of precise language helps ensure that parties to a contract-even sophisticated parties represented by able attorneys-understand that the contract's terms disclaim reliance, such that the contract may be binding even if it was induced by fraud." Id. The negation-of-warranty clause in this case makes no mention of either fraud or reliance, but pertains only to failure of title. Nevertheless, JPMorgan does not contend that justifiable reliance fails as a matter of law because the parties disclaimed fraud causes of action. Indeed, in its briefing JPMorgan carefully and persuasively distinguishes contractual terms that negate justifiable reliance because they directly contradict an oral representation from Italian Cowboy -type contractual clauses that expressly waive fraud causes of action. And because this is a direct-contradiction case and not a waiver case, it falls outside Italian Cowboy 's purview.

Either "red flags" alone or direct contradiction alone can negate justifiable reliance as a matter of law. Compare Westergren , 453 S.W.3d at 424-25 ("[A] party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous terms." (citing Thigpen , 363 S.W.2d at 251 ) ), and DRC , 112 S.W.3d at 858 ("[R]eliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law."), with Grant Thornton , 314 S.W.3d at 923 ("[A] person may not justifiably rely on a misrepresentation if 'there are "red flags" indicating such reliance is unwarranted.' " (quoting Lewis , 343 F.3d at 546 ) ). In this case, however, both theories apply. And either would be sufficient to preclude justifiable reliance.