**Reversed and Rendered and Opinion Filed December 14, 2020**



In The
**Court of Appeals**
**Fifth District of Texas at Dallas**

_____

**No. 05-18-00860-CV**
_____

**BBVA COMPASS AND SAM MEADE, Appellants**
**V.**
**DAVID BAGWELL, INDIVIDUALLY AND AS TRUSTEE OF THE DAVID S. BAGWELL TRUST, BROUGHTON LIMITED PARTNERSHIP, OLD GROVE LIMITED PARTNERSHIP, AND BROADLAND LIMITED PARTNERSHIP, AND MARILYN D. GARNER, CHAPTER 7 TRUSTEE OF THE ESTATE, AND DAVID BAGWELL COMPANY, EVERMORE COMMUNITIES, LTD., AND THE OXFORD CORPORATION, Appellees**

**On Appeal from the 101st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-14-00991**

## MEMORANDUM OPINION

Before Justices Myers, Whitehill, and Pedersen, III
Opinion by Justice Pedersen, III

BBVA Compass and Sam Meade (together, the Bank) appeal the trial court's judgment finding the Bank liable for fraud and awarding appellees approximately $50.5 million in actual damages, $40 million in exemplary damages, plus prejudgment and postjudgment interest. In this Court, the Bank contends that (1) appellees' claims are barred by the statute of frauds, (2) insufficient evidence supports the fraud elements of causation and justified reliance, (3) appellees' claims

are barred by the statute of limitations, (4) appellees are not entitled to recover any of the actual damages awarded, and (5) appellees are not entitled to recover exemplary damages in this case. We reverse the trial court's judgment and render judgment that appellees take nothing on their claims.

## BACKGROUND

David Bagwell, a residential land developer with over forty years of experience in that business, planned three luxury subdivisions in Colleyville Texas. He raised money from investors and—working through three limited partnerships (appellees Broughton L.P., Broadland L.P., and Old Grove L.P.)—acquired and began to develop the subdivisions. In all, Bagwell's plan anticipated the sale of 264 lots for an average price of approximately $160,000 each. In 2006, after selling just more than half of the lots, the three limited partnerships borrowed $11 million from Texas State Bank. The notes were guaranteed by Bagwell individually and by appellees the David S. Bagwell Trust, the David Bagwell Company, and Evermore Communities, Ltd.[1] When BBVA acquired first Texas State Bank and then Compass Bank, BBVA Compass became the owner of the partnerships' notes and guarantees.

The terms of the loans are not in dispute. Each note was secured by the partnership's underlying real estate. The Bank had the right to sell or assign the loans

---

[1] The trial court made separate awards to the corporate guarantors, who intervened in the lawsuit below, and they have filed a separate brief in this Court. That brief, however, addresses only issues of the timing of their intervention in the suit and the damages awards. For purposes of the Bank's liability for fraud, the same analysis applies to all appellees.

to a third party without notice to the borrower and without the borrower's permission. The notes specifically stated that their terms could not be "contradicted by evidence of prior, contemporaneous or subsequent oral agreement of borrower and lender" and that no term could be modified except by written amendment.

The loans became due on February 1, 2008. The Bank agreed in written modification agreements to extend the maturity date to May 1, 2008, but Bagwell was still unable to make the required payments on that date. In July, Bagwell was notified that the loans were being sent to the Bank's Special Assets Group for collection. Late that year, Bagwell and the Bank signed a second modification agreement that included (a) assignment of the partnerships' proceeds from mineral lease bonuses (approximately $1.6 million) to the Bank, and (b) an extension of the notes' maturity until December 1, 2009.

By June 2009, Bagwell was already beginning efforts to obtain a third extension. He sent Gary Noble, a Compass loan officer, a number of proposals.[2] In August, Compass acquired Guaranty Bank, and a new loan officer, appellant Meade, was assigned the Bagwell loans. Meade first spoke to Bagwell on November 6, 2009. At that time Bagwell restated his proposals from June; Meade testified he told Bagwell then that he did not believe the proposals were workable. Nevertheless, he

---

[2] Bagwell's proposals included: limited lot price discounts for cash purchases, vendor financing, advertising to reach prospective buyers about favorable sale terms, and speculative homebuilding ventures with local luxury home builders.

emailed Bagwell, saying: "I want to go in and extend the loans for at least 60 days while we see if one of the discussed proposals will work." Bagwell contends that he believed the Bank was going to do this short extension and then follow it with a longer one. But the Bank never offered Bagwell a written extension on the maturity date for the Notes.

Early in 2010, Bagwell received calls from two business colleagues reporting information that suggested the Notes were being offered for sale by the Bank. Paul Kramer, a local homebuilder and customer of Bagwell, informed Bagwell that he had heard a rumor the partnerships' lots were being sold. Bagwell testified that he sought and received a meeting with Meade on January 4 and that he asked Meade whether the Notes had been sold or were in the process of being sold; Meade told him no. Bagwell testified that he asked Meade to check around and determine if anyone else at the Bank was working on selling the Notes; Meade said that he would.

Days later, Bagwell received a second call, this time from a local retired homebuilder, Terry Horton. Horton said Bagwell should know his Notes were being offered for sale. He told Bagwell that he had been contacted by a "money fund" and asked to visit and evaluate the real estate involved in Bagwell's development. Bagwell was concerned about the continuing rumor. He met with Meade again on January 11, and he "pressed" Meade for information. He testified that Meade told him he checked—as Bagwell had requested—and found no one working on selling the Notes. According to Bagwell, Meade said "if the bank were working on selling

your notes, I would know about it and I don't know about it." Bagwell related further that Meade thought that if the Bank were going to sell the partnerships' loans that it would have to have the partnerships' permission to do that. Then Meade closed the meeting by saying "as for me, I'm working on getting your loans extended."

Meade testified that Bagwell told him in November, the first time they met, that he had no wherewithal to pay what he owed on the notes. Meade testified further that Bagwell never came to him and offered information about "any investor or friend or acquaintance or anyone who was going to help him refinance or pay off or restructure the notes." Indeed, Bagwell testified that, faced with this debt he could not pay, what he did was wait to see if the Bank would offer some way to work it out. It did not. Instead, the Bank sold Bagwell's loans to Toll Brothers, a national homebuilder, which foreclosed upon the property securing the Notes.

Bagwell sued the Bank and Meade for fraud based on Meade's alleged oral representations. The trial court awarded summary judgment to the Bank, and Bagwell appealed. We concluded that the statute of frauds barred Bagwell's claim for benefit-of-the-bargain damages. *Bagwell v. BBVA Compass*, No. 05-14-01579-CV, 2016 WL 3660403, at *12 (Tex. App.—Dallas July 7, 2016, no pet.) (mem. op.) [hereinafter *Bagwell I*]. We affirmed the summary judgment in all respects save one: we reversed "to the extent appellants [sought] to recover out-of-pocket damages for fraud." *Id.* And we remanded for that limited purpose.

On remand, the case proceeded to trial, and the jury found in favor of Bagwell on the fraud claim and awarded him more than $98 million. The Bank appeals.

## DISCUSSION

The Bank raises five issues for our review.

### Statute of Frauds

In its first issue, the Bank argues that the statute of frauds—on which *Bagwell I* was premised—allows Bagwell to recover only out-of-pocket expenditures incurred in reliance on Meade's representations. Bagwell contends that the Bank misunderstands *Bagwell I* and that the statute of frauds prohibits only benefit-of-the bargain damages; he argues that consequential damages are not based on the benefit of an unenforceable bargain, so neither the statute of frauds nor *Bagwell I* prohibits their recovery. Bagwell argues further that mental anguish and exemplary damages are appropriate fraud recoveries that are not based on the benefit of his admittedly unenforceable oral bargain.

We need not determine whether the damages Bagwell claims were properly recoverable in this case. Any damages he claims as a fraud plaintiff require proof of the elements of fraud, and we conclude that Bagwell cannot establish all of those elements.

### Justifiable Reliance

To prevail on a fraud claim, a plaintiff must establish that: (1) the defendant made a material representation that was false; (2) the defendant knew the

–6–

representation was false, or he made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and suffered injury as a result. *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018). In its second issue, the Bank contends that Bagwell cannot establish the fourth element, i.e., actual justified reliance on the purported representation.[3] The challenge, in essence, is to the legal sufficiency of the evidence supporting justifiable reliance, *see id.*, so we consider the evidence in the light most favorable to appellees, crediting evidence a reasonable jury could credit and disregarding contrary evidence and inferences unless a reasonable jury could not, *id.* (citing *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013)). Judgment contrary to a jury verdict is proper "only when the law does not allow reasonable jurors to decide otherwise." *Id.* (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005)).

Although justifiable reliance usually presents a question of fact, it "can be negated as a matter of law when circumstances exist under which reliance cannot be justified." *Id.* at 654. The Supreme Court of Texas has recently identified two circumstances in which a plaintiff's purported reliance upon an oral misrepresentation is unjustifiable: when "red flags" preclude such reliance, *id.* at

---

[3] The Bank's second issue also challenges Bagwell's proof that the purported misrepresentation proximately caused him injury. We do not reach that portion of the issue.

–7–

655, and when the representation directly contradicts the parties' written agreement, *id.* at 658. Either of these circumstances can alone be sufficient to negate justifiable reliance as a matter of law. *Id.* at 660, n.2.[4] The Bank's argument centers on the presence of a trio of red flags that—it contends—should have alerted Bagwell that his reliance was unwarranted. Our analysis, rooted in the nature of the parties' relationship and the contract, *id.* at 654, leads us to agree.

One may not justifiably rely on a representation when red flags indicate that reliance is unwarranted. *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010). In the context of a contractual relationship, this rule speaks to circumstances surrounding an oral representation that would warn a person of the plaintiff's experience and sophistication that he ought not to place confidence in that representation. *See, e.g., Orca Assets*, 546 S.W.3d at 656 ("[W]orld-savvy participants entering into a complicated, multi-million-dollar transaction should be expected to recognize 'red flags' that the less experienced may overlook.").

---

[4] The supreme court has subsequently confirmed that either the presence of red flags or a representation directly contradicting the parties' agreement can serve to negate justifiable reliance:

> Although *Orca Assets* discusses both direct contradiction and other red flags, it does not require them both to negate justifiable reliance. In fact, we noted just the opposite, stating that either could be sufficient to preclude justifiable reliance. *Id.* at 660 n.2. In truth, when a plaintiff asserts reliance on a misrepresentation that the written contract directly and unambiguously contradicts, both are present because the existence of such a conflict is itself a large red flag. *See id.* at 658 (stating that written contract's direct contradiction was "another alarm Orca disregarded").

*Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 559 (Tex. 2019).

Neither party in this case pretends to be less than experienced and sophisticated in commercial real estate transactions. The transaction at issue began with a loan for $11 million that Bagwell asserts would have led to profits of many times that amount. Our law charges these parties with exercising care to protect their own interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party. *See Mikob Props., Inc. v. Joachim*, 468 S.W.3d 587, 599 (Tex. App.—Dallas 2015, pet. denied). Thus, Bagwell—as an experienced businessman, and borrower, in this field—was required to establish that when he relied upon Meade's oral representations, he was reasonably protecting his multi-million-dollar interest in the transaction.

The Bank contends that at least three red flags would have sufficiently warned someone in Bagwell's position that his reliance on Meade's representations could not be justified.

The Loan Documents:

First, the loan documents themselves provided that the parties' agreement could not be amended except in writing. The earlier extensions granted by the Bank had been put in writing, but no third written extension was ever put in writing and signed by the parties. Accordingly, Bagwell was not justified in relying on any representation that the Bank would grant him another extension.

Likewise, the loan documents gave the Bank the authority to sell Bagwell's loans at any time, without notice to him. That authority was not revoked in writing.

–9–

Thus, Bagwell could not justifiably rely on a contrary representation by Meade. *See Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 499 (Tex. 2019) (oil and gas production company's oral representation that it would not exercise its authority to prevent assignment of its interest by well driller "directly contradicted" contract giving production company right to prevent assignment, foreclosing justifiable reliance). In Bagwell's case, the contract gave the Bank the right to sell the loans, but if Meade's alleged oral representations were to be believed, the Bank would not exercise that right—at least, Bagwell suggests, not without giving him notice. Bagwell contends that if had he known the Bank was considering selling the loans, he would have moved them to some unnamed lender that was not interested in foreclosing upon his properties. In effect, thus, he contends that the Bank's authority to sell the loans was subject to a condition that exists nowhere in the parties' agreement. Bagwell could not have justifiably relied upon such an interpretation of the contract. *See id.*

A representation that contradicts the parties' agreement is both a red flag that should be heeded and is—on its own—a basis for negating justified reliance as a matter of law. *Carduco*, 583 S.W.3d at 559 ("In truth, when a plaintiff asserts reliance on a misrepresentation that the written contract directly and unambiguously contradicts, both are present because the existence of such a conflict is itself a large red flag."). This ground alone, then, negates justified reliance.

<u>Specific Warnings</u>:

The Bank relies as well on the fact that two of Bagwell's friends and colleagues in the development business told him that the Bank was trying to sell his loans. Bagwell acknowledges that these warnings caused him to go to Meade to follow up. The reports were significant red flags that a sophisticated borrower would have heeded. Indeed, according to Bagwell, he questioned Meade after receiving both of these reports, indicating that he "harbored doubts" about the status of the loans. *See Orca Assets*, 546 S.W.3d at 656.

<u>Knowledge of Unreliability</u>:

The Bank also points to another of Meade's alleged representations: that the Bank would require Bagwell's approval to sell the loans. Bagwell knew that representation was untrue, and he asserts that he did not rely on it specifically. But knowing that Meade had made one such unreliable statement regarding selling the loans was yet another red flag for Bagwell.

Bagwell responds to the Bank's arguments by conceding that it had a right to sell the loans but not a "right to lie" about its intentions. We are unaware of any legal concept embracing—or rejecting—a so-called "right to lie." Our common law protects a plaintiff from deceit when the plaintiff can prove fraud. But fraud has well-defined elements, which include justifiable reliance upon the deceitful

–11–

representation. Given the red flags evidenced in this record, we conclude Bagwell has failed to prove that element of his fraud claim.[5]

Considering all the evidence of the nature and circumstances of the parties' relationship as well as their agreement, we conclude that justifiable reliance has been negated as a matter of law. *Carduco*, 583 S.W.3d at 563; *Orca Assets*, 546 S.W.3d at 654. The law would not allow reasonable jurors to decide otherwise. *Orca* Assets, 546 S.W.3d at 653. We sustain the Bank's second issue challenging the justifiable-reliance element of Bagwell's fraud claim. In the absence of justifiable reliance, appellees' fraud claim fails. We need not reach the Bank's remaining issues.

## CONCLUSION

We reverse the trial court's judgment and render judgment that Bagwell take nothing on his claim.

/Bill Pedersen, III//
BILL PEDERSEN, III
180860f.p05                                                   JUSTICE

---

[5] We are not to be understood as condoning the Bank's conduct in this case. Counsel for the Bank referred to "side whispers" when addressing oral representations among those doing business. If Meade made the representations as Bagwell alleges, they were not side whispers; they were outright misrepresentations. As a matter of policy, businesses should deal with their customers in a more straightforward manner.

–12–



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

BBVA COMPASS AND SAM
MEADE, Appellants

No. 05-18-00860-CV      V.

DAVID BAGWELL,
INDIVIDUALLY AND AS
TRUSTEE OF THE DAVID S.
BAGWELL TRUST, BROUGHTON
LIMITED PARTNERSHIP, OLD
GROVE LIMITED PARTNERSHIP,
AND BROADLAND LIMITED
PARTNERSHIP, AND MARILYN
D. GARNER, CHAPTER 7
TRUSTEE OF THE ESTATE, AND
DAVID BAGWELL COMPANY,
EVERMORE COMMUNITIES,
LTD., AND THE OXFORD
CORPORATION, Appellees

On Appeal from the 101st Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-14-00991.
Opinion delivered by Justice
Pedersen, III. Justices Myers and
Whitehill participating.

In accordance with this Court's opinion of this date, the judgment of the trial
court is **REVERSED** and judgment is **RENDERED** that appellees David Bagwell,
individually and as Trustee of the David S. Bagwell Trust, Broughton Limited
Partnership, Old Grove Limited Partnership, and Broadland Limited Partnership,
and Marilyn D. Garner, Chapter 7 Trustee of the Estate, and David Bagwell
Company, Evermore Communities, and The Oxford Corporation: take nothing.

It is **ORDERED** that appellants BBVA Compass and Sam Meade recover
their costs of this appeal from appellees David Bagwell, individually and as
Trustee of the David S. Bagwell Trust, Broughton Limited Partnership, Old Grove

Limited Partnership, and Broadland Limited Partnership, and Marilyn D. Garner, Chapter 7 Trustee of the Estate, and David Bagwell Company, Evermore Communities, and The Oxford Corporation.

Judgment entered this 14th day of December, 2020.