

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-20-00116-CV

———————————————

BRAXTON MINERALS II, LLC AND ROBERT SCOTT BAUER, Appellants

V.

PENN INVESTMENT FUNDS, LLC, Appellee

On Appeal from the 141st District Court
Tarrant County, Texas
Trial Court No. 141-290089-17

Before Birdwell, Womack, and Walker, JJ.
Memorandum Opinion by Justice Birdwell

**MEMORANDUM OPINION**

Appellee Penn Investment Funds, LLC (PIF) won a summary judgment on its fraud claim against appellants Robert Scott Bauer and his company Braxton Minerals II, LLC. On appeal, Bauer and Braxton contend that deficiencies in PIF's proof of damages precluded summary judgment. They also maintain that attorney's fees are not available on a claim of common law fraud. Because we agree, we reverse and remand.

## I. BACKGROUND

In June 2015, Bauer wrote a check for $30,000 to his former fraternity brother, who worked for a contractor hired by Antero Resources Corporation. In exchange, Bauer's fraternity brother gave him a hard drive full of Antero title opinions concerning mineral-rich land in West Virginia that Antero was targeting for energy development.

In 2016, Bauer used the title opinions as the basis for an investment scheme. Bauer plotted to cheaply acquire the mineral rights to the West Virginia land before Antero could get to them and then lease the minerals to Antero for a profit. He began to solicit potential investors, one of whom was Joe Penn, the owner of appellee PIF.

To make the proposed venture seem more appealing, Bauer made multiple grandiose representations via text and email about his capabilities, each of which PIF now alleges was fraudulent. For one, Bauer told Penn that his company Braxton[1] had

---

[1]The appellant here, Braxton Minerals II, LLC, is one of several Braxton entities that were involved in this suit. Because there is nothing of consequence to this appeal that differentiates these entities, we refer to them simply and collectively as Braxton.

2

developed a sophisticated artificial intelligence platform—the first of its kind—that could automate the title research process for oil and gas exploration, providing a competitive advantage. But Penn introduced evidence that there was no such technology and that the source of Bauer's competitive advantage was actually the ill-gotten title opinions from Antero.

Another set of alleged misrepresentations concerned Bauer's relationships with certain players in the oil and gas industry. Bauer touted his bond with a prominent oil and gas investor named Paul B. Loyd. Bauer variously claimed that Loyd was his "mentor" and among his "closest friends," that Loyd had agreed to be Braxton's chairman and CEO, and that Loyd was heavily invested in Braxton's dealings. Bauer also represented that he had an inside track with Antero. At one point, Bauer stated that his "pledge brother" ran "Antero's title and acquisition department" and had provided Bauer with private information on Antero's targets for acquisition. At another point, Bauer claimed he was meeting with Antero's CEO to seal a $600 million deal, saying that Bauer had received inside information because "I now have the strongest relationship that I've had with Antero." But Penn offered evidence that Bauer's claims concerning the strength of his relationships were overstated—and indeed, that Bauer would soon be embroiled in fraud and trade secret litigation with Loyd and Antero that would result in a multi-million-dollar judgment against Bauer and Braxton and an injunction barring them from using or divulging Antero's trade secrets, including the title opinions.

Finally, to sweeten the proposed deal with Penn further, Bauer offered to do the West Virginia transaction "at my cost," promising that 100% of Penn's capital infusion would be used to acquire minerals. But Penn proffered at least some evidence that there was over $225,000 of hidden profit for Bauer and Braxton built into the transaction.

Penn and Bauer discussed various terms for a transaction, but they eventually settled on a short-term loan of $1,668,000 from PIF to Braxton in order to fund the acquisition of minerals in West Virginia. According to the loan's term sheet, Braxton agreed to repay the principal, along with a fee of 10% of the principal, in sixty business days. To finance the transaction, Penn borrowed $1,778,000 from his uncle Claude at 10% annual interest. Bauer and Penn agreed that Bauer would deed the minerals to PIF in order to secure the loan until Bauer could lease the minerals to Braxton or sell them outright to Loyd. And Bauer led Penn to believe that he could complete the lease to Braxton or sale to Loyd—and thus repay the loan—within ten days, which he described as a "conservative[]" projection.

Sometime around October 12, 2016, Bauer and Penn sealed the loan transaction, and Penn arranged for PIF to transfer the $1,668,000 to Braxton. Braxton drew up deeds to transfer the minerals to PIF as agreed. However, it is undisputed that neither the sale to Loyd nor the lease to Antero ever materialized, so Bauer and Braxton never repaid the loan. Penn began trying to sell the minerals.

4

Meanwhile, on January 23, 2017, PIF sued Bauer, Braxton, and others for fraud, unjust enrichment, breach of contract, and declaratory judgment, among other claims.

On June 14, 2017, PIF arranged to sell the minerals to an Oklahoma oil company for $1,900,000, which represented a profit on its initial loan, though with some delay beyond the loan's original repayment date.

PIF moved for summary judgment on its fraud claim. Bauer and Braxton filed an untimely response, which the trial court struck. The trial court granted summary judgment and awarded PIF actual damages of $332,230.56, attorney's fees of $192,236.48, punitive damages of $524,467.04, court costs, and post-judgment interest. Bauer and Braxton appeal.

## II. DISCUSSION

Within their first issue, Bauer and Braxton contend that the trial court erred by granting summary judgment because there were deficiencies in PIF's evidence of damages. They assert that PIF's proof of damages consists solely of its own discovery responses and a conclusory affidavit from Penn, neither of which PIF may properly rely on as summary judgment evidence. Bauer and Braxton also maintain that the award of attorney's fees should be reversed because attorney's fees are not available on a claim of common law fraud, which was the lone cause of action on which PIF obtained summary judgment. We agree with Bauer and Braxton on both accounts.

We review an order granting summary judgment de novo, taking as true all evidence favorable to the nonmovant and indulging every reasonable inference in the

5

nonmovant's favor. *AEP Tex. Cent. Co. v. Arredondo*, 612 S.W.3d 289, 293 (Tex. 2020). As the party moving for traditional summary judgment, PIF had the burden to prove that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Id.* "When a movant meets that burden of establishing each element of the claim or defense on which it seeks summary judgment, the burden then shifts to the non-movant to disprove or raise an issue of fact as to at least one of those elements." *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 511 (Tex. 2014). If the movant does not satisfy its initial burden, the burden does not shift, and the non-movant need not respond or present any evidence. *Id.* "This is because summary judgments must stand or fall on their own merits, and the non-movant's failure to answer or respond cannot supply by default the summary judgment proof necessary to establish the movant's right to judgment." *Id.* at 511–12 (cleaned up). "Thus, a non-movant who fails to raise any issues in response to a summary judgment motion may still challenge, on appeal, the legal sufficiency of the grounds presented by the movant." *Id.* at 512 (cleaned up).

To prevail on a fraud claim, a plaintiff must show: (1) the defendant made a material representation that was false; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and suffered injury as a result. *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653–

6

54 (Tex. 2018). As to injury, "Texas recognizes two measures of direct damages for common-law fraud: the out-of-pocket measure and the benefit-of-the-bargain measure." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998) (op. on reh'g). "The former derives from a restitutionary theory while the latter derives from an expectancy theory." *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015) (cleaned up). "Benefit-of-the-bargain damages are measured by the difference between the value as represented and the value received, allowing the injured party to recover profits that would have been made had the bargain been performed as promised." *Id.*

PIF claimed that it was entitled to $349,126.69 in damages in connection with its loan to Bauer and Braxton and the delay before the loan was repaid. PIF also sought $93,040.11 in damages for the cost of prolonging its funding agreement with Claude, who had lent PIF $1,778,000 at 10% annual interest in order to finance PIF's transaction with Braxton.

As factual support for these numbers, PIF relied primarily on its own responses to requests for disclosure. But a party may not use its own responses to requests for disclosure as summary judgment proof. *Abdo v. Richmond Stop Food Mart*, No. 01-20-00031-CV, 2021 WL 3358017, at *3 (Tex. App.—Houston [1st Dist.] Aug. 3, 2021, no pet. h.) (mem. op.); *Stauder v. Nichols*, No. 01-08-00773-CV, 2010 WL 2306385, at *7 (Tex. App.—Houston [1st Dist.] June 10, 2010, no pet.) (mem. op.); *see also Yates v. Fisher*, 988 S.W.2d 730, 731 (Tex. 1998) (same as to interrogatory responses).

PIF also relied on an affidavit drafted by Penn. But in his affidavit, Penn made no effort to quantify PIF's damages; he simply declared that PIF incurred a variety of damages without factually explaining his conclusion. "A conclusory statement is one that does not provide the underlying facts to support the conclusion." *Atmos Energy Corp. v. Paul*, 598 S.W.3d 431, 467 (Tex. App.—Fort Worth 2020, no pet.). "Conclusory statements are not proper summary judgment proof." *Id.* Without any valid numerical support for its liquidated damages, we cannot say that PIF conclusively proved the damages element of its case. *See, e.g., Sung Uh Kang v. Jin Song*, No. 02-15-00148-CV, 2016 WL 4903271, at *3 (Tex. App.—Fort Worth Sept. 15, 2016, no pet.) (mem. op.).

PIF also claimed that it was entitled to $192,236.48 of attorney's fees that it incurred in prosecuting its suit. However, PIF moved for and obtained summary judgment solely on its fraud claim, and a plaintiff may not recover attorney's fees in a common-law fraud action. *Alexander v. Kent*, 480 S.W.3d 676, 698 (Tex. App.—Fort Worth 2015, no pet.) (citing *MBM Fin. Corp. v. The Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 667 (Tex. 2009), among others).[2]

We therefore conclude that the summary judgment was in error. We sustain Bauer and Braxton's first issue. This renders it unnecessary to consider their second

---

[2]There are other potential issues with PIF's evidence of damages, but the foregoing discussion suffices to demonstrate that PIF has not shown that it is entitled to judgment as a matter of law.

issue and their other arguments attacking the summary judgment, which would afford them no greater relief.

### III. CONCLUSION

We reverse the trial court's judgment and remand the case for further proceedings consistent with this opinion.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: September 23, 2021