

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00242-CV
_____

SOUTHERN ENERGY FUND 2, L.P.; WY-VEL CORPORATION; AND HIRA
CAPITAL, Appellants

V.

INDIO RESOURCES, LLC F/K/A INDIO MINERALS, LLC, Appellee

On Appeal from the 97th District Court
Archer County, Texas
Trial Court No. 2018-0090A-CV

Before Birdwell, Bassel, and Walker, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

### I. Introduction

Appellee Indio Resources, LLC f/k/a Indio Minerals, LLC assigned to Appellant Southern Energy Fund 2, L.P. (SEF2) a one-half overriding royalty interest (ORRI)[1] in two wells located in Archer County and assigned one-quarter ORRIs in these wells to Appellants HIRA Capital and Wy-Vel Corporation after Appellants made the winning bid on an online auction site. Appellants subsequently sued Indio for fraudulent inducement and fraud by nondisclosure based on the materials that Indio had posted on the auction site. The trial court granted summary judgment to Indio on Appellants' fraud claims and ordered them to pay Indio $264,018.62 in attorney's fees. In two issues, Appellants challenge both rulings.[2] We affirm.

### II. Background

Robert Wallace, Indio's manager, and Hunter Allen, owner of Overton Park Oil & Gas, L.P. f/k/a Broman Oil & Gas, L.P., were college friends in the early

---

[1]An ORRI is a nonparticipating interest in oil and gas produced at the surface, free of production expenses, carved out of a working interest under a mineral lease. *Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 742 n.2 (Tex. 2020). Absent an agreement otherwise, an ORRI terminates when the lease terminates. *Id.*

[2]Appellants also complain that the trial court erred by granting summary judgment on their negligent-misrepresentation claim, but they neither pleaded this claim in the trial court nor briefed it on appeal.

2000s.[3] Wallace and Allen partnered together in March 2013 to acquire the two Archer County wells at issue from Rogers Drilling using EnergyNet.com, Inc. (EnergyNet), an online auction site for the sale of oil-and-gas interests. Thus, Indio and Overton Park became the owners of the two wells. These were the first wells that Wallace and Allen bought together—one well on each unit of land. They did not have a geologist analyze the wells or perform any engineering or reservoir studies before they paid roughly $600,000 for each well, and they had no written plan or projection for how long they might own or operate them. When they acquired the wells, the net revenue interest (NRI)[4] was around 76% to 80%, and royalties and overrides accounted for the remaining 20% to 24%.

Allen testified that "there's 100 different factors" to look at when trying to acquire an oil-and-gas property; the factors include cash flow and assumption of liability for plugging and environmental cleanup. The Archer County wells had no liability and a strong cash flow.

After acquiring the wells, Wallace and Allen obtained from Rogers Drilling "a slice of 3-D seismic and evaluated it." Allen described it as a one-page sheet that they had asked Ron Rogers about when they went to pick up the title files at Rogers

---

[3]Wallace graduated with a degree in economics in 2006 and then worked as a landman before partnering with Allen. Allen had a degree in petroleum land management.

[4]NRI is the right to receive revenue from production; it is "the revenue side of the interest in [a] well."

Drilling. Rogers did not mention anything to them about pressure issues or a water-boundary issue, and they did not ask him any questions about those things. According to Allen, they learned about the water-drive formation after they bought the wells and thus decided not to use pump jacks because it did "not make any sense from a reservoir standpoint to put pump jacks on the[] wells."

Wallace put the 3-D seismic information into ArcGIS, a mapping software, "to try to create a model" of the reservoir. He used the information from the well logs to calculate volumetrics with regard to porosity and water saturation. Wallace stated that the 3-D seismic information that he had looked at related to additional target zones in the Mississippi Lime formation, where the two wells were located. Wallace's father, a reservoir engineer, advised him on how to calculate and look at volumetrics, which can be used to determine whether one should drill more wells or deepen a well.

In May 2013, Wallace and Allen decided to sell some of the revenue interests in the Archer County wells because they needed cash to acquire more properties. Wallace stated that when they decided to sell the ORRI two months after purchasing the wells, the wells had been "consistent," and there had been "[n]o issues." They primarily used Rogers Drilling's production history and marketing materials—"the same materials that [Indio had] used to purchase" the wells—in their own EnergyNet post. However, they made in the executive summary two statements upon which part of the litigation is based and which are italicized below:

4

Broman Oil & Gas LP and Indio Minerals LLC, propose to sell a 2% [ORRI] in the Friday Unit #1 and Livingston-Colgan Unit #1 wells and associated leasehold. The leases consist of 390.2 acres[,] and both wells are producing from the Mississippi Lime formation. The wells are located approximately three miles Northwest of Megargel, TX.

The Friday Unit #1 well was drilled by Rogers Drilling Company, Inc. in August 2010 to a total depth of 5144'. The well encountered the top of the Mississippi Lime at 5118'[,] and casing was set to 5121' in the top of the pay. The well was completed by drilling out the casing shoe and completing the well open-hole. During the past 28 months[,] oil production rate and pressures have stabilized at 23 BOPD on a 4/64" choke with 680 psig flowing tubing pressure and 720 psig casing pressure. The well has a cumulative production of 21.5 Mbo as of late March 2013.

The Livingston-Colgan Unit #1 well was drilled by Rogers Drilling Company, Inc. in August 2010 to a total depth of 5102'. The well encountered the top of the Mississippi Lime at 5100'[,] and casing was set to 5101' with a formation pack-off shoe in the top of the pay. The well was completed by drilling out the casing shoe and completing the well open-hole. The formation was treated with 205 gallons of 15% HCl. The oil production rate and pressures have stabilized at 22 BOPD on a 4/64" choke with 680 psig flowing tubing pressure and 700 psig casing pressure. The well has a cumulative production of 19.5 Mbo as of late March 2013.

Both wells have produced consistently over their past 26–28 months with no substantive changes in the flowing pressures. The only variation in production has occurred when the wells have been shut-in due to inability to get the oil picked up from the tank batteries.

*Sellers intend to use the proceeds from the sale of this* [ORRI] *to fund* [*their*] *ongoing acquisition and development program.*

This part of Archer [C]ounty has a significant amount of production from the Mississippian, Gunsight, Strawn, and Caddo formations[,] and *the operator is currently analyzing 3D seismic and well logs to locate additional target zones on the 390.2 acres held by these two wells.* [Emphases added.]

Wallace testified that he and Allen had added the first italicized sentence because they had seen other sellers state similar things on EnergyNet and in other marketplaces and because buyers typically questioned why a property was being sold. Allen stated that EnergyNet had suggested including the sale's reason. Wallace stated that they did not specify which properties they were planning to acquire and develop because the one they were looking at in Arkansas was in bankruptcy and because they did not know if they would be the successful bidder.[5]

Wallace claimed that they had added the second italicized sentence about the "3D seismic" because he and Allen had analyzed that information with regard to his volumetrics calculations. But in a mid-May 2013 email, Allen told Wallace that he had decided "to be vague on additional zones," and Wallace testified that he had been in agreement with the vagueness because they "didn't have a particular zone that [they] had identified." Allen also told Wallace in an email that he was wary of overselling, stating, "Since we're pretty sure Rogers [Drilling] didn't see much and [because] the nearest great offset Caddo, Strawn[,] and Gunsight are a decent ways off, I think we're

---

[5]After acquiring the two Archer County wells, Wallace and Allen bought wells in Arkansas, Colorado, Wyoming, New Mexico, North Dakota, and Montana. Wallace testified that he did what he said he would do regarding the "ongoing acquisition and development program" sentence, stating,

> I went and acquired an asset in Arkansas. I went and developed that asset in Arkansas. I went and acquired an asset in West Texas[] in Howard County. I went and worked over the wells in Howard County. I also acquired another asset in Yoakum County. . . . It's exactly what I said I was going to do, and I did it.

best off dropping the hint about 3-D and doing some research without trying to oversell the additional potential thing." Wallace testified that he had agreed with this because they "didn't want to oversell anything to anybody" but that he did not know "one way or another" about whether they had been sure Rogers Drilling had not seen much in the area.

In emails exchanged between May 15 and May 16, 2013, Allen stated to Wallace, "[P]eople will likely not notice [that] we sold a 1[% ORRI] in these same wells five to six times." He also stated that 2% was the perfect number: "I'm thinking we'll be best off if we sell in 2% increments 2% $2k/month x 60 = $120k sweet spot. If it goes higher, that's awesome, but I think we should put a reserve floor around $90-100k (45-50 months)." And he stated that he liked Wallace's father's idea "about selling down until people stop paying a reasonable figure." Allen added, "If we can sell down to 65[%] net revenue and pull out $1 million, why not? I guess we'll see," and he followed this sentence with a "smiley emoji at the end." Wallace testified that the sell-down had been his idea, not his father's, but he insisted that at that point, they had not tested the market and did not know whether the first ORRI would sell.

Wallace claimed that any such plans were contingent on whether the first sale took place because they were trying to use the money from the sale for their ongoing acquisition and development program. Wallace stated, "[W]e didn't know what that program was going to entail, and so we didn't have, you know, a set plan. If it didn't sell, we obviously weren't going to sell anything." However, Allen sent an email to an

EnergyNet employee in May 2013 in which he stated, "Let me know what we need to do next to get our land files uploaded. We're looking at selling a 2% [ORRI] in these couple wells[,] three times or maybe more. So that once we have everything set up in your system[,] we can use mostly the same sales materials."

On May 17, 2013, Wallace executed EnergyNet's Seller's Agreement, and Indio posted the ORRI interest in the two Archer County wells for sale as Lot 28134, with a reserve price of $90,000. Rupesh Shah, president of SEF2 and HIRA Capital,[6] had electronically signed the buyer's representations and warranties that incorporated EnergyNet's Buyer's Agreement by reference two days before. The Buyer's Agreement included an acknowledgment and agreement that the purchase of properties "is subject to terms and conditions of the Seller's Agreement and hereby states that BUYER has read and understands the same." The Seller's Agreement contains a reciprocal clause, stating, "SELLER acknowledges and agrees that its sale of Properties is subject to terms and conditions of the BUYER'S AGREEMENT TO PURCHASE PROPERTIES, attached hereto as Exhibit 'E,' and hereby states that SELLER has read and understands the same."[7] Appellants submitted the winning bid.

After Appellants won the bid, Gregory J. Petruska, the sole managing member of Spectrum Resources, LLC, which later joined Appellants in the lawsuit against Indio, contacted Wallace to ask about buying an additional 2% ORRI, which Allen

---

[6]Ken Lemons, Shah's business partner, owns Wy-Vel.

[7]When applicable, we refer to both agreements collectively as the Agreement.

and Wallace then sold to Spectrum. Indio subsequently sold ten to twelve additional 2% ORRIs between October 2013 and December 2014, obtaining between $113,000 and $186,000 per sale. Allen testified that he and Wallace had started looking at developing the wells around the same time that they had started selling the ORRIs and that Wallace's father or someone Wallace's father knew had looked at the well logs and had told them that there was something there but not enough to move forward and that the 3-D seismic information was inconclusive. Allen admitted in his deposition that they had never put additional capital into the two Archer County wells beyond paying Steven Symank, the pumper.

The price of oil crashed in November 2014, and in 2015, Indio curtailed production. According to Wallace, the oil price caused the production curtailment, while Allen stated that production had showed a major drop-off in spring 2015 because of loss in pressure and choking back production—from 550 barrels in January to 330 barrels in February to 34 barrels in May. They stopped selling ORRIs because of the low oil price and because they "didn't want to give away [their] asset."

Between March 2015 and June 2016, Petruska emailed and called Allen about production, and then Petruska called Shah and asked him if he knew that the wells' operators "ha[d] continued to sell down 2[%] interest[s] and [that] at the same time they ha[d] not done any work nor do they have any intent to do any work on the wells." Shah stated that he had no idea before Petruska called him. Allen stated that some of his phone conversations with Petruska were "pretty heated" and

9

"accusatory" with regard to Indio's operation of the wells, but he did not feel that way about Shah, stating that Shah "was really nice to work with."

Wallace and Allen's partnership ended in 2015. In 2018, Spectrum joined Appellants in suing Indio and Overton Park. Indio secured Spectrum's dismissal on a Rule 91a motion, and Spectrum was ordered to pay attorney's fees to Indio—$14,882 for the Rule 91a motion and then $3,000 to cover Indio's motion to compel payment of the Rule 91a attorney's fees. Overton Park subsequently settled with Appellants, leaving Indio and Appellants as the only parties to the dispute. The trial court granted summary judgment on Appellants' fraud claims, found breach of contract and entitlement to attorney's fees in Indio's favor on a Rule 166(g) motion, and entered judgment for $264,018.62 in Indio's favor after a jury trial on the amount of attorney's fees. This appeal followed.

### III. Summary Judgment

In their first issue, Appellants complain that the trial court erred by granting summary judgment on their fraud claims.

#### A. Standard of review

We review a summary judgment de novo. *Travelers Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848

(Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). A defendant that conclusively negates at least one essential element of a plaintiff's cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010). Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence that raises a fact issue. *Van v. Peña*, 990 S.W.2d 751, 753 (Tex. 1999).

## B. Appellants' claims

In their lawsuit, Appellants alleged that Indio had made a variety of misrepresentations in its EnergyNet advertising and that Appellants had submitted their bid in reliance on those misrepresentations. They also complained that Indio's scheme to deplete NRI to below 60% and Indio's refusal to purchase pumps to increase production showed Indio's failure to act as a reasonably prudent operator. Appellants claimed that Indio had employed a scheme to sell ORRIs and capture up front all of the units' future values until it was uneconomical to produce oil from them, forcing them to be shut in and resulting in a windfall of cash to Indio.

Appellants asserted that Indio had concealed from them Indio's knowledge about production issues, its lack of development plans, and its sell-down scheme— thus creating a false impression about the leases' value—and that Indio had omitted material facts, including that (1) Indio had secretly planned to never develop the

11

leases, (2) Indio had secretly planned to sell down huge interests in the leases that would prevent it from economically operating the leases to Appellants' detriment, (3) Indio had known the leases were at the end of their production cycle based on communications from the leases' former operator, and (4) Indio had not been actually examining seismic data or target zones for further production. Appellants claimed that they never would have purchased their interests if Indio had disclosed these material facts.

**C. Indio's summary-judgment motions on Appellants' fraud claims**

Indio moved for partial summary judgment on Appellants' fraud-by-nondisclosure and fraudulent-inducement claims. In its traditional and no-evidence motion for summary judgment on Appellants' fraud-by-nondisclosure claim, Indio argued that it had no duty to disclose future production or development plans to an ORRI owner; that its evidence conclusively showed that it did not discover new information that made an earlier representation untrue or misleading and that it did not make a partial disclosure that created a false impression or voluntarily disclose some information that created a duty to disclose the whole truth; and that Appellants had no evidence that any alleged nondisclosures had caused an injury, including no expert testimony that Indio's operating decisions were unreasonable or violated any duties owed to Appellants. Specifically, Indio pointed out that there was no fact-witness or expert-witness testimony or other evidence (1) that it had "destroyed" the working-interest economics by selling additional ORRIs; (2) that Indio had rendered the wells

"uneconomical to produce oil" based on mismanagement; or (3) that the sell-down had operated in any way "to the detriment of the interest owners, like [Appellants]."

In its traditional motion for summary judgment on Appellants' fraudulent-inducement claim, Indio argued, among other things, that Appellants' reliance was unjustified as a matter of law. To both motions, Indio attached the Agreement, the ORRI Assignment, and deposition excerpts.

Indio's summary-judgment evidence showed that to participate in an EnergyNet online auction, a buyer had to agree to the Buyer's Agreement's terms and conditions and had to acknowledge and represent that it was a sophisticated, accredited, and qualified investor. The first page of the Buyer's Agreement states that "ANY DECISIONS BASED UPON THE INFORMATION CONTAINED IN THIS WEBSITE ARE THE SOLE RESPONSIBILITY OF THE USER." By executing the Buyer's Agreement to purchase the properties, the buyer acknowledged and represented that

A. It is primarily engaged in the business of exploring for or producing oil or gas or other minerals as an ongoing business;

B. By reason of this knowledge or experience, the BUYER or its representative will evaluate the merits and risks of the Properties to be purchased on the Website and will form an opinion based solely upon its knowledge and experience and not upon any statement, representation, or printed material provided or made by [EnergyNet] and its representatives or SELLER;

C. The BUYER, being of legal age, has sufficient financial resources in order to bear the risk of loss attendant to the purchase of

13

the Property. "Sufficient Financial Resources" are to be defined as follows . . . .

Paragraph 3 of the Buyer's Agreement required the buyer to perform its own due diligence and independent evaluation, stating that

> BUYER hereby acknowledges and agrees that it has the sole responsibility to examine all information concerning ownership and production of the Properties placed for sale on the Website by the SELLER. Further, BUYER acknowledges and agrees that if it requires more information concerning said Properties, BUYER must contact [EnergyNet] or the SELLER to obtain requested information prior to the beginning date of the Online Auction.

> BUYER further agrees that it will make an independent evaluation of the Property and acknowledges that SELLER and [EnergyNet] have made no statements or representations concerning the present or future value of the future income, costs[,] or profits, if any, to be derived from the Property.

> BUYER further acknowledges that in making its BID in the Online Auction or any subsequent negotiations, it has relied solely upon its independent examination of the premises and public records, and BUYER'S BIDS and offers are based solely on BUYER'S independent inspections, estimates, computations, evaluations, reports, studies[,] and knowledge of the Properties. Any and all information provided by SELLER or [EnergyNet] in the Property Information Sheet data packages as well as any other information provided by SELLER or [EnergyNet] as requested by BUYER are furnished to BUYER at BUYER'S sole risk. SELLER and [EnergyNet] do not warrant or represent as to the accuracy or completeness of the data presented to the BUYER, and BUYER agrees to indemnify and hold [EnergyNet] and SELLER harmless from any reliance by BUYER on data provided by the SELLER and/or [EnergyNet].

The Buyer's Agreement also explicitly stated that no warranties were made as to the property, stating,

14

Notwithstanding any provision contained in this Agreement to the contrary, BUYER acknowledges and agrees that it is acquiring the Properties, wells, equipment, or other property located thereon from SELLER without warranty whatsoever, express, statutory, or implied as to description, title, condition, quality, fitness for purpose, merchantability, or otherwise. BUYER acknowledges and agrees that neither SELLER nor [EnergyNet] makes any representation or warranty whatsoever as to the physical condition of the Property nor any statements or representation concerning the present or future value of the anticipated income, costs, or profits, if any, to be derived from the Property. BUYER ACKNOWLEDGES AND AGREES THAT ALL PROPERTY IS SOLD ON AN "AS IS"/"WHERE IS" CONDITION.

The Buyer's Agreement also provided that the buyer "acknowledges and agrees that its purchase of Properties is subject to [the] terms and conditions of the Seller's Agreement and hereby states that BUYER has read and understands the same."

The Buyer's Agreement concluded with a merger clause providing that the agreement and "all attached Exhibits and the instruments delivered or required to be delivered pursuant hereto" supersede all prior negotiations, understandings, and agreements between the parties "relating to the subject matter hereof and constitute the entire understanding and agreement between the parties with respect thereto" and that no alterations, modifications, amendments, or changes in the Agreement "shall be effective or binding unless the same shall be in writing and shall have been executed by BUYER and [EnergyNet]."

The ORRI Assignment specified that "[n]o obligations, express or implied, shall arise by reason of the assignment of the Override which shall obligate Assignors to maintain the Leases by any method, including payment of delay rentals,

15

compensatory royalties, other payments, or by the drilling of any wells on the Lands subject to the Leases."

## D. Appellants' consolidated summary-judgment response

Appellants filed a consolidated response to Indio's partial summary-judgment motions on the fraud claims. In their response, Appellants argued that their summary-judgment evidence showed that Indio had affirmatively misled them and had withheld critical known information that had induced them to buy the ORRIs. Appellants asserted that the alleged disclaimers in the Buyer's Agreement were not effective to defeat their claims, they objected to some of Indio's summary-judgment evidence,[8] and they asserted that the *Forest Oil* factors[9] weighed in their favor.

To their consolidated summary-judgment response, Appellants attached a

---

[8]The trial court overruled Appellants' objections to Indio's summary-judgment evidence. In an unnumbered issue, *cf.* Tex. R. App. P. 38.1(f), Appellants complain, "Appellants' [sic] object[ed] to the unsigned Buyer's Agreement submitted in support of Appellees' MPSJ." However, this complaint ignores Shah's acknowledgment in his deposition that he executed the Buyer's Agreement on May 15, 2013, and Appellants do not refer us to any authority to support their argument, *see* Tex. R. App. P. 38.1(i), or to explain how they were harmed in light of Shah's acknowledgment, *see* Tex. R. App. P. 44.1.

[9]In *Forest Oil Corp. v. McAllen*, the supreme court listed the following non-exclusive factors to consider in determining whether a disclaimer of reliance bars a fraudulent-inducement claim: (1) whether the contract terms were negotiated rather than boilerplate and whether the parties specifically discussed the disputed issue during negotiations; (2) whether the complaining party was represented by counsel; (3) whether the parties dealt with each other in an arm's-length transaction; (4) whether the parties were knowledgeable in business matters; and (5) whether the release language was clear. 268 S.W.3d 51, 60 (Tex. 2008); *see Int'l Bus. Machs. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 229 (Tex. 2019).

redacted email between Wallace and Allen and the full depositions of Wallace, Allen, Shah, Petruska, and Symank. Appellants also attached Indio's sales-pitch excerpts and incorporated by reference Petruska's and Shah's affidavits that were attached to their summary-judgment response to Indio's summary-judgment motion on Indio's counterclaim. With the exception of Shah's deposition, none of this evidence addresses the reliance element of Appellants' fraud claims.[10]

Shah, who testified as SEF2's corporate representative, had degrees in economics and chemical engineering. He and Lemons, Wy-Vel's owner, had started a company in 2010 to acquire royalty and non-operator working interests. Before that, Shah had also started his own company in the oil-and-gas industry, HIRA Capital. He agreed that SEF2's website explained that it had evaluated property interests to acquire with capital, that SEF2 was funded entirely by royalties, and that the website

---

[10]Appellants' evidence also did not support its fraud claim related to Indio's alleged failure to act as a reasonably prudent operator. Petruska, a petroleum engineer who had worked for Chevron before obtaining a master's degree in business administration, conceded in his deposition that as an ORRI owner, he could not tell an operator what to do and agreed that he was not rendering an expert opinion about whether Indio was a bad operator. Shah also agreed in his deposition that he was not an expert witness and was not offering any expert opinions on Indio's alleged "failure to act as a reasonably prudent operator."

In contrast, Symank, a pumper with twenty-five years' experience in the area who had overseen production from the two wells since their drilling in 2010 or 2011, testified that wells in the Mississippi Lime formation were notorious for "being finicky" but that these two wells had been "exceptionally good." Symank, who owned some Archer County wells in a different formation, opined that there was nothing he would have done differently from Indio if the two wells had been his and that Indio had done a good job operating them.

17

proclaimed SEF2's "expertise" in "acquiring royalty interests and working interests in currently producing wells at an excellent price yielding great returns" and "invest[ing] in oil and gas interests that already ha[d] a positive cash flow and a well[-]established production history." SEF2's website further stated, "Each well is carefully analyzed to determine the remaining years of production available, following which the production analysis is integrated with a financial model to come up with a valuation based on targeted investment returns," and it listed its evaluation processes as incorporating (but not being limited to) geology and reservoir formations, well maintenance, depletion scenarios, completion technology, casing type, production analysis, revenue-expense statements, survey plats, well test reports, and offset data. Shah said these were just examples and agreed that "statements made by the operator" was not on the list. He did not recall examining offset data for Lot 28134 or recall if it was a water-driven reservoir.

Before the instant transaction, Shah had purchased five to ten properties on EnergyNet, and he understood that to make purchases on EnergyNet, a buyer had to be a sophisticated investor who could assume the risk of bidding. After his transaction with Indio, he had bid on and had won at least twenty-five other bids on EnergyNet.

In his deposition, Shah agreed that he had understood on May 15, 2013, when he had executed the Buyer's Agreement to participate in the EnergyNet marketplace, that there were certain responsibilities and obligations attached to his buying properties on EnergyNet, including representations about conducting his own due

18

diligence and not relying on representations by Allen or Wallace. Regarding the Buyer's Agreement, Shah agreed that he had waived reliance on the seller's representations, but he nonetheless complained that he had not known "that [Wallace and Allen] would be just straight up making up information," and he stated that Appellants would not have made the purchase if they had known the truth.

## E. Indio's summary-judgment reply and objections

Indio filed a single reply to Appellants' consolidated summary-judgment response. In its reply, Indio pointed out anew that the Buyer's Agreement expressly disclaimed reliance as to the accuracy or completeness of the data provided and that there was no evidence of reliance. Indio also objected to some of Appellants' summary-judgment evidence, specifically portions of Shah's and Petruska's affidavits. The trial court sustained Indio's objections to portions of the Petruska and Shah affidavits.[11]

## F. Analysis

Like other fraud claims, fraudulent inducement and fraud by nondisclosure share the element of reliance. Fraudulent inducement is a "species of common-law fraud" that "arises only in the context of a contract." *Int'l Bus. Machs.*, 573 S.W.3d at 228 (quoting *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018)). To establish fraudulent inducement, a plaintiff must show that (1) the defendant made a material

---

[11]Because Appellants do not appeal the trial court's rulings on these objections, we have not considered these portions in our review of the summary-judgment evidence.

representation; (2) the defendant knew at the time that the representation was false or lacked knowledge of its truth; (3) the defendant intended that the plaintiff should rely or act on the misrepresentation; (4) the plaintiff relied on the misrepresentation; and (5) the plaintiff's reliance on the misrepresentation caused injury. *Id.* The plaintiff's "reliance" on the false promise "induces" the plaintiff to agree to a contract to which he or she would not have agreed if the defendant had not made the false promise. *Id.*

A clause that clearly and unequivocally expresses the party's intent to disclaim reliance on the specific misrepresentations at issue can preclude a fraudulent-inducement claim. *Id.* at 229 (listing the *Forest Oil* factors); *see Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 332 (Tex. 2011) ("[W]hen sophisticated parties represented by counsel disclaim reliance on representations about a specific matter in dispute, such a disclaimer may be binding, conclusively negating the element of reliance in a suit for fraudulent inducement."); *see also Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 563 (Tex. 2019) (holding that reliance was unjustified as a matter of law when the defendant's conduct and actions upon which the plaintiff relied to establish its fraudulent-inducement claim were directly contrary to the parties' contract's unambiguous terms); *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 660 (Tex. 2018) (noting that "no reasonable, sophisticated entity could read [the negation-of-warranty clause] and plausibly believe the [defendant's prior representation;] they are in direct contradiction"). Not every disclaimer is effective, and whether a party is liable in any particular case depends on

20

the contract's language and the totality of the surrounding circumstances. *Int'l Bus. Machs.*, 573 S.W.3d at 226, 229. The question of whether an adequate disclaimer of reliance exists is a matter of law. *SSCP Mgmt. Inc. v. Sutherland/Palumbo, LLC*, No. 02-19-00254-CV, 2020 WL 7640150, at *8 (Tex. App.—Fort Worth Dec. 23, 2020, pet. denied) (mem. op. on reh'g) (quoting *Italian Cowboy Partners*, 341 S.W.3d at 333).

Fraud by nondisclosure is a subcategory of fraud that occurs when a party has a duty to disclose certain information and fails to disclose it. *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219 (Tex. 2019). To establish fraud by nondisclosure, the plaintiff must show (1) the defendant deliberately failed to disclose material facts; (2) the defendant had a duty to disclose such facts to the plaintiff; (3) the plaintiff was ignorant of the facts and did not have an equal opportunity to discover them; (4) the defendant intended the plaintiff to act or refrain from acting based on the nondisclosure; and (5) the plaintiff relied on the nondisclosure, which resulted in injury. *Id.* at 219–20.

Although Appellants complain that the Buyer's Agreement did not meet the required standard of clearly and expressly disclaiming reliance, as set out above, the disclaimers of reliance in the Agreement—although boilerplate[12]—were comprehensive, were clear and unambiguous, were made at arm's length, and required

---

[12]The *Forest Oil* factors do not require that every sentence in a contract be negotiated. *Int'l Bus. Machs.*, 573 S.W.3d at 229 n.4.

21

the buyer to represent that it was sufficiently knowledgeable to participate in the sale. *See Forest Oil*, 268 S.W.3d at 60.

Further, Appellants' summary-judgment evidence did not raise a fact issue about reliance. To the contrary, Shah's deposition testimony established that he was a sophisticated, experienced oil-and-gas investor who had used EnergyNet to make purchases both before and after the instant transaction and that he was aware of and had agreed to the Buyer's Agreement's specific terms that he would not rely on anything submitted by a seller. *See JPMorgan Chase Bank*, 546 S.W.3d at 654 (noting that in an arm's-length transaction, a failure to exercise reasonable diligence "is not excused by mere confidence in the honesty and integrity of the other party").

We conclude that the trial court did not err by granting summary judgment on Appellants' fraudulent-inducement claim because, as a matter of law, their reliance was not justifiable. Furthermore, because their reliance was not justifiable as a matter of law, this same ground bars their fraud-by-nondisclosure claim. *See Endeavor Energy Res., L.P. v. Cuevas*, 593 S.W.3d 307, 312 (Tex. 2019); *JPMorgan Chase Bank*, 546 S.W.3d at 660; *see also G & H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011) ("If the defendant has conclusively disproved an ultimate fact or element which is common to all causes of action alleged . . . the summary judgment may be affirmed." (quoting Timothy Patton, *Summary Judgments in Texas: Practice, Procedure and Review* § 3.06[3] at 3–20 (3d ed. 2010))). We overrule Appellants' first issue without reaching their remaining arguments. *See* Tex. R. App. P. 47.1.

22

## IV. Attorney's Fees

In their second issue, Appellants complain (1) that Texas law does not allow the recovery of attorney's fees on a defensive motion for summary judgment on tort claims; (2) that Texas law does not allow for the fee recovery pursuant to the Agreement's "legal proceedings to enforce the Agreement" language because that language does not apply to fraud and tort claims between parties to the agreement; and (3) that Indio was not a party to the Buyer's Agreement and therefore could not rely on it to support its attorney's-fee claim. We begin with the procedural background of the parties' attorney's-fee dispute.

### A. Background

The attorney's-fee issue initially arose after Indio counterclaimed for breach of contract, alleging that by filing suit, Appellants had breached Paragraph 3 of the Buyer's Agreement. Paragraph 3 provides, in pertinent part, that "BUYER agrees to indemnify and hold [EnergyNet] and SELLER harmless from any reliance by BUYER on data provided by the SELLER and/or [EnergyNet]." Indio complained that Appellants sought to effectively rewrite the Agreement and to obtain damages from Indio in breach of Appellants' promise to hold Indio harmless from any reliance. Indio sought "direct damages, including costs, attorney's fees, and expenses[,] which Indio would not have incurred" but for Appellants' "failure . . . to honor the agreement."

## 1. Indio's summary-judgment motion on its counterclaim

Indio moved for partial summary judgment on its breach-of-contract counterclaim, arguing that the Agreement's indemnification paragraph allowed its legal expenses to be treated as the damages resulting from the breach and that by filing suit, Appellants had judicially admitted to breaching the Agreement by failing to hold Indio "harmless from any reliance by [Appellants] on data provided by [Indio]." That is, "by filing [Appellants'] lawsuit in which they judicially admit that they relied upon representations concerning the value of the subject property allegedly made by [Indio], [Appellants] have breached numerous promises contained in the Buyer's Agreement, including their promise to hold [Indio] harmless from any such reliance." To its motion, Indio attached Appellants' first amended petition, the ORRI Assignment, and the Buyer's Agreement.

## 2. Appellants' summary-judgment response and Indio's reply

Appellants responded that there could be no indemnification for Indio's own torts, that Indio was not a party to the Buyer's Agreement, that Indio had failed to present competent summary-judgment evidence to support its counterclaim, and that fact issues as to Indio's allegedly fraudulent conduct negated the counterclaim.

Indio replied that the Buyer's and Seller's Agreements operated together and incorporated each other by reference, that Indio was a third-party beneficiary of the Buyer's Agreement with standing to assert breach, and that only if Appellants were

24

able to prove—not merely allege—fraudulent inducement could they potentially defend against their breach of the Buyer's Agreement.

### 3. Trial court's ruling

The trial court denied Indio's partial summary-judgment motion on its breach-of-contract counterclaim.

### 4. Indio's fee application

After the trial court denied Indio's partial summary-judgment motion on its breach-of-contract counterclaim and granted Indio's summary-judgment motions on Appellants' fraud claims, Indio sought to recover $135,136.92 in attorney's fees, plus conditional appellate attorney's fees, under the Agreement's prevailing-party clause.[13] Indio argued that because it had prevailed on the summary-judgment motions that "sought to enforce the terms, limitations, and waivers of the Buyer's and Seller's Agreements against [Appellants'] claims for fraudulent inducement and fraud by nondisclosure," it should receive its "costs and reasonable attorneys' fees incurred in connection with this litigation." Indio incorporated by reference its summary-judgment motions and reply to support its argument that it had "resort[ed] to this legal proceeding to enforce the terms of the Buyer's and Seller's Agreements as a bar against [Appellants'] claims."

---

[13]Section 24.1 of the Seller's Agreement and Section 23.1 of the Buyer's Agreement—both labeled "Governing Law and Litigation Costs"—state, "In the event that any party to this Agreement resorts to legal proceedings to enforce this Agreement, the prevailing party in such proceedings shall be entitled to recover all costs incurred by such party, including reasonable attorney fees."

### 5. Appellants' response

Appellants responded by arguing that the fee claim was based on defending against noncontractual tort claims, not to enforce the Agreement; that Indio was not a party to the contract; that Indio could not recover fees on a defensive motion for summary judgment; and that the trial court had already denied Indio's partial summary-judgment motion for breach of contract in which Indio sought the recovery of attorney's fees under a breach-of-contract theory.

### 6. Letter ruling #1

In a letter ruling, the trial court found that the provisions of the Agreement "relating to the recovery of costs and attorneys' fees in proceedings by a party to enforce the Agreement" did not authorize the recovery of attorney's fees under these circumstances and that Indio's actions in relation to Appellants' fraud claims were "not proceedings to enforce the contract," and it denied Indio's request. Indio then moved to realign the parties based on the trial court's having granted summary judgment on Appellants' fraud claims, and the trial court granted that motion.

### 7. Indio's new theories and Rule 166(g) motion

In its new position as plaintiff, in a motion for determination of issues of law, *see* Tex. R. Civ. P. 166(g), Indio sought attorney's fees based on (1) its breach-of-contract claim on Appellants' failure to indemnify Indio and hold it harmless for the claims and causes of action contained in Appellants' original and first amended

petitions,[14] and (2) "pursuant to the attorney[-]fee provisions in the governing contracts in what is now indisputably a proceeding by Indio to affirmatively enforce the subject agreements."

---

[14]An indemnity agreement "provides the indemnitee with a cause of action to recover against the indemnitor." *Audubon Indem. Co. v. Custom Site-Prep, Inc.*, 358 S.W.3d 309, 319 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (citing *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1993)).

While an indemnity agreement generally does not apply to claims *between* the parties to an agreement, *Nat'l City Mortg. Co. v. Adams*, 310 S.W.3d 139, 144 (Tex. App.—Fort Worth 2010, no pet.) (op. on reh'g), it may expressly include language indicating that it also applies to *direct* claims between the indemnitor and the indemnitee, *Sam Rayburn Mun. Power Agency v. Gillis*, No. 09-16-00339-CV, 2018 WL 3580159, at *18 (Tex. App.—Beaumont July 26, 2018, pet. denied) (mem. op.). *See Ganske v. Spence*, 129 S.W.3d 701, 708 (Tex. App.—Waco 2004, no pet.) ("[W]e should not be heard to say that an indemnity provision cannot be written such that the parties indemnify each other against claims they later assert against the other."); *see also Osprin II, LLC v. TX 1111 Rusk GP LLC*, No. 06-21-00085-CV, 2022 WL 2541932, at *10 (Tex. App.—Texarkana July 8, 2022, pets. filed) (mem. op.) (stating that plaintiff must show "that the indemnity agreement contains language indicating that it applies to claims between the parties").

The indemnity clause here expressly addresses indemnity against the buyer's reliance, stating,

> SELLER and [EnergyNet] do not warrant or represent as to the accuracy or completeness of the data presented to the BUYER, and BUYER *agrees to indemnify and hold* [*EnergyNet*] *and SELLER harmless from any reliance by BUYER on data provided by the SELLER and/or* [*EnergyNet*]. [Emphasis added.]

*See, e.g.*, *GE Oil & Gas Pressure Control, L.P. v. Carrizo Oil & Gas, Inc.*, No. 01-21-00285-CV, 2023 WL 3513141, at *24 (Tex. App.—Houston [1st Dist.] May 18, 2023, no pet. h.) (mem. op.) ("The statement—*whether asserted directly by Customer or by a third party*—expresses an intent for Carrizo to provide GE with first-party indemnification."). In his deposition, Shah replied, "Yes," when asked whether he

### 8. Appellants' response and Rule 166(g) motion

Appellants responded that attorney's fees were not "damages" for breach of contract and that Indio had no real underlying "claim" against it because it was "really asserting an affirmative defense of a waiver of reliance under the guise of a 'breach of contract.'" Appellants also filed their own Rule 166(g) motion, to seek dismissal of Indio's attorney's-fees claims based on the Agreement's language with regard to "legal proceedings to enforce the Agreement."

### 9. Indio's response to Appellants' Rule 166(g) motion

In its response to Appellants' Rule 166(g) motion, Indio complained that Appellants had ignored the new bases that it had raised for recovering its attorney's fees and costs. Indio specifically pointed out that Appellants' Rule 166(g) motion did not "address the alternative arguments that Indio is entitled to an award of its attorneys' fees because . . . in filing the instant litigation, [Appellants] breached their indemnity and hold[-]harmless obligations set forth in the Contract."

Indio then added a third alternative basis under Civil Practice and Remedies Code Section 38.001 against Wy-Vel. Although Indio stated that it was not reurging the earlier theories that it had presented based on its successful summary-judgment motions, Indio nonetheless also incorporated those earlier arguments by reference.

---

understood that the Agreement's indemnity paragraph meant that he was responsible for paying Indio's legal fees if he relied on their data.

28

Indio also incorporated by reference its own Rule 166(g) motion and requested the denial of Appellants' Rule 166(g) motion.

**10. Letter ruling #2**

In a July 9, 2021 letter ruling, the trial court took judicial notice of all of the pleadings on file, denied Appellants' Rule 166(g) motion, and found that Indio's Rule 166(g) motion "should be granted in all things." The trial court also made the following affirmative findings:

- the subject transactions were governed by the Agreement;

- Indio was a party to the Agreement and entitled to enforce it against Appellants;

- the filing of Appellants' claims against Indio violated the Agreement's indemnity obligations and the "Governing Law and Litigation Costs provisions in Sec. 23.1 of the Buyer's Agreement";

- the filing of such claims against Indio in violation of these provisions was a "direct cause of Indio['s] sustaining damages in the form of attorneys' fees and litigation expenses"; and

- Indio was entitled to recover damages "in the form of attorney['s] fees, court costs[,] and litigation expense[s] associated with the present lawsuit, in an amount to be determined at a later hearing."

**11. Subsequent proceedings**

Two months after the trial court granted Indio's Rule 166(g) motion, on September 3, 2021, Appellants filed a letter with the trial court in which they asserted that the trial court's letter ruling had determined the legal issue of recovery of fees *if* Indio prevailed on its underlying claim, and they asked for a jury trial on the issues of

29

the alleged breach of contract and indemnity in addition to reasonableness of fees. Four days later, Indio filed its own letter in which it complained that Appellants had misconstrued the letter ruling because the trial court had made specific findings that left only the amount of attorney's fees, court costs, and litigation expenses to be determined.

On September 7, the trial court held a hearing, noting that it had received both parties' letters. At the hearing, Appellants insisted that fact issues remained, arguing, "Even if Your Honor had found as a matter of law a breach of contract or an indemnification obligation, there's still a fact issue of what's the amount of indebtedness to that[,] and we would like that to be tried to the jury." Indio's counsel replied that the liability-as-to-contractual-indemnification issue had already been resolved in Indio's favor. The trial court asked Indio's counsel if, by having found that attorney's fees would be recoverable on the face of the contract, it had essentially laid to rest the underlying breach-of-contract issue, leaving before it the factual determination of the amount of attorney's fees. Indio's counsel replied affirmatively, stating,

> My understanding of the [c]ourt's ruling was that in the [c]ourt['s] determining that the indemnification rights would apply, . . . the [c]ourt found that . . . a proper claim for all fees and costs incurred could be properly submitted to the [c]ourt for determination on whether or not that satisfied the standard as set forth by the contract . . . .

Appellants' counsel then argued that the trial court had made, "out of efficiency," a ruling that "*if* the claim is found in the plaintiff's favor, the fees are

30

recoverable" and then the question became the recoverable amount. [Emphasis added.] Appellants' counsel asked for a "simple one-day jury trial on those remaining claims and issues with the fees being a part of that if the jury finds in the plaintiff's favor." He insisted that the breach-of-contract claim was still outstanding. The trial court stated that its ruling had been a ruling on the law but expressed its concern about ruling on the actual amount of attorney's fees requested. At the conclusion of the hearing, the trial court ordered that Appellants were "entitled to a jury trial on the amount" of attorney's fees.

Nine months later, a one-day jury trial was held. During opening statements, Indio's counsel told the jury that after reviewing the contract, his legal strategy had been to become "a prevailing party under the contract[ and] to enforce [Indio's] rights under the contract" and that the $214,000 that Wallace had incurred had been reasonable to defend his company and his reputation. Appellants' counsel then told the jurors that their task was to decide "what is reasonable and necessary in fees in this case for [Indio]" and that over $200,000 was not a reasonable amount on a claim involving the purchase of an oil-and-gas interest for $187,000.

The jury awarded to Indio $264,018.62 in attorney's fees in a nonunanimous verdict upon considering the sole issue of the amount of attorney's fees.[15] The judgment recites that after the summary judgments on Appellants' fraud claims, "the

_____

[15]We note that $50,000 of that amount was requested as conditional appellate attorney's fees but that the jury verdict and the judgment merely state a lump sum.

31

only claim remaining" was the claim that Appellants had "violated the Buyer's Agreement and the Governing Law and Litigation Costs provisions in Section 23.1 by wrongfully filing claims against [Indio]" and that "[o]n July 9, 2021[,] the [c]ourt ruled as a matter of law that [Appellants] were in direct violation of the contractual provisions referenced and directly caused [Indio] to sustain damages in the form of attorneys' fees, court costs, and litigation expense[s] associated with the present lawsuit."

## B. Analysis

In their second issue, Appellants complain that Indio cannot recover attorney's fees on a defensive motion for summary judgment on tort claims or under the Agreement's "legal proceedings to enforce the Agreement" language based on tort claims and that Indio was not a party to the Buyer's Agreement and therefore cannot rely on it to support its attorney's-fee claim. We begin with Appellants' last argument, as it is the only portion of the trial court's Rule 166(g) ruling that they expressly challenge.

Separate contracts may be part of a "single, unified instrument" if each instrument is a necessary part of the same transaction, even if the parties executed the instruments at different times. *See Rieder v. Woods*, 603 S.W.3d 86, 94–95 (Tex. 2020). Here, the transaction could not have occurred without the parties' execution and compliance with the Buyer's and Seller's Agreements, which incorporated each other. Further, the Buyer's Agreement contains specific acknowledgments of the Buyer's duties and representations to the Seller, as well as the Buyer's acknowledgment of

32

choice of law and venue for any action by the Buyer or the Seller arising under the Agreement. Both the Buyer's and Seller's Agreements included a merger clause that acknowledged that each agreement and the attached exhibits (which included the reciprocal incorporated agreements) constituted "the entire understanding and agreement between the parties." Under the plain language of these documents,[16] we conclude that the Buyer's and Seller's Agreements were a single, unified instrument, *see id.*, and we overrule this portion of Appellants' second issue.

The record reflects that the parties brought competing Rule 166(g) motions with regard to Indio's right to attorney's fees. Rule 166(g) authorizes a trial court to decide matters that, although ordinarily fact questions, have become questions of law because reasonable minds cannot differ on the outcome. *JPMorgan Chase Bank*, 546 S.W.3d at 653. When a Rule 166(g) order disposes of claims in this fashion, the order is akin to a summary judgment or directed verdict, and review is de novo. *Id.*; *cf. Soefje v. Jones*, 270 S.W.3d 617, 625 (Tex. App.—San Antonio 2008, no pet.) (noting that summary judgment is the preferred method for pretrial disposal of a case in its entirety); *Unitrust, Inc. v. Jet Fleet Corp.*, 673 S.W.2d 619, 623 (Tex. App.—Dallas 1984, no writ) (noting that when issues are disputed, "the appropriate procedure for

---

[16]Under traditional contract-construction principles, a contract's plain language controls, its words must be construed in context, and the entire writing must be examined and considered in an effort to harmonize and give effect to all of the contractual provisions so that none will be rendered meaningless. *In re Whataburger Rests. LLC*, 645 S.W.3d 188, 194–95 (Tex. 2022) (orig. proceeding). Contract construction's primary goal is to effectuate the parties' intent as expressed in the contract. *Monroe Guar. Ins. v. BITCO Gen. Ins.*, 640 S.W.3d 195, 198–99 (Tex. 2022).

summarily disposing of a case is by a summary[-]judgment hearing . . . in which both parties have the opportunity to present affidavits, admissions, and depositions[] and to fully present their claims").

As pointed out by Indio, Appellants do not challenge the actual ground—breach of the Agreement's indemnity clause—upon which the trial court awarded the "prevailing party" fees in its Rule 166(g) order and in its final judgment. Appellants likewise do not challenge the trial court's affirmative findings in the Rule 166(g) order that support Indio's breach-of-contract claim or raise any arguments about the procedure used to secure the ruling. *See* Tex. R. Civ. P. 166(g) (stating that to assist in the case's disposition without undue expense or burden to the parties, the court may in its discretion direct the parties to appear for a conference to consider "[t]he identification of legal matters to be ruled on or decided by the court"); *Provident Life & Accident Ins. Co. v. Hazlitt*, 216 S.W.2d 805, 807 (Tex. 1949) (noting that although controverted fact issues could not be adjudicated under Rule 166(g), "orders could be entered disposing of issues [that] are founded upon admitted or undisputed facts"). Appellants do not challenge the trial court's recitation in the judgment that Indio's breach-of-contract claim was resolved in its Rule 166(g) order on July 9, 2021, and they do not challenge the sufficiency of the evidence to support the jury's fee award.

Because a Rule 166(g) disposition is treated like a summary judgment for purposes of appeal, *JPMorgan Chase Bank*, 546 S.W.3d at 653, we will apply the rule that "[w]hen an argument is not made challenging every ground on which the summary

34

judgment could be based, we are required to affirm the summary judgment, regardless of the merits of the unchallenged ground." *Rollins v. Denton Cnty.*, No. 02-14-00312-CV, 2015 WL 7817357, at *2 (Tex. App.—Fort Worth Dec. 3, 2015, no pet.) (mem. op.); *see also Cano v. N. Tex. Nephrology Assocs., P.A.*, 99 S.W.3d 330, 339 (Tex. App.—Fort Worth 2003, no pet.) (stating that the appellate court must affirm a directed verdict even though the trial court's rationale was erroneous if the directed verdict can be supported on another basis). Because Appellants have not challenged the basis or procedure for the trial court's Rule 166(g) ruling and most of its findings in that order, as well as in the judgment, we overrule their second issue without reaching their remaining arguments. *See* Tex. R. App. P. 47.1; *Rollins*, 2015 WL 7817357, at *2.

## V. Conclusion

Having overruled both of Appellants' issues, we affirm the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: June 29, 2023