# Supreme Court of Texas

No. 23-0564

Roxo Energy Company, LLC; Roxo Energy, LLC; REC Minerals, LLC; Roxo FW, LLC; and Vortus Investment Advisors, LLC,

*Petitioners*,

v.

Baxsto, LLC,

*Respondent*

On Petition for Review from the
Court of Appeals for the Eleventh District of Texas

## PER CURIAM

"Written agreements, relative to oral agreements, serve a purpose under the law to provide greater certainty regarding what the terms of the transaction are and that those terms will be binding, thereby lessening the potential for error, misfortune, and dispute." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 498 (Tex. 2019) (internal quotation omitted). This case requires us to again consider the viability of claims based on alleged oral representations that are inconsistent with the parties' written contracts. The district court rejected all claims on summary judgment. The court of appeals

reversed. Relying primarily on *Barrow-Shaver*, we reverse the court of appeals' judgment and reinstate the district court's summary judgment on all claims.

**I**

In October 2016, Baxsto LLC began negotiating a lease of its mineral interests with Todd Fitzgerald, Roxo Energy's CEO. Roxo[1] was partially funded by Vortus, a private equity group that participated in some of the negotiations.

Baxsto owned mineral interests in Howard and Borden Counties. Fitzgerald allegedly represented that (1) if Baxsto would execute a lease quickly, Roxo would give Baxsto the most favorable deal of any owner in the area; (2) Roxo was "not in the business of flipping mineral interests" and intended to drill the acreage; and (3) Roxo planned to make its money "at the bit" by drilling and developing the land. Roxo indicated throughout the lease negotiations that it was also interested in purchasing the mineral interests.

The initial negotiations resulted in three written agreements: a "paid-up"[2] oil and gas lease, a lease purchase agreement, and a lease memorandum. The lease purchase agreement established conditions on which Roxo could purchase the paid-up lease (as distinguished from a purchase of the minerals, which happened later). The lease

---

[1] "Roxo" refers to several related entities with which the parties are familiar.

[2] "A 'paid-up' lease is one under which all delay rentals bargained for are paid in advance, and this single payment maintains the lease during the primary term." *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 874 (Tex. 2018).

memorandum summarized the instruments for the purpose of recording in the property records. These agreements provided, among other things, that (1) Roxo could only record the lease after it paid a bonus of $5,000 per acre to Baxsto and (2) Roxo had an option period in which to purchase the lease ("lease purchase option"). Without Baxsto's knowledge, Roxo recorded the lease memorandum before making any bonus payment.

In a later meeting, Vortus represented that it only invested in companies that drilled acreage. Both Roxo and Vortus again stated that they were not in the business of "flipping" mineral interests.

Roxo was given two extensions of time on its lease purchase option. The first extension included a "most favored nations" clause, which provided that if, within the next six months, Roxo paid a larger bonus to a qualifying lessor, Roxo would pay the same amount to Baxsto. Before the second extension was signed, Roxo disclosed that it was negotiating with Navigator Oil and Gas, a mineral owner in the same acreage as Baxsto. After the second extension, Roxo paid the bonus and acquired the lease. At this time, Roxo revealed Vortus had reduced its funding commitments for developing the minerals. Baxsto was disappointed in this development and was eager to monetize its mineral interests one way or another. The parties began negotiating an outright sale of Baxsto's mineral interests to Roxo.

On May 26, 2017, the parties closed on the sale of Baxsto's mineral interests for $5,666,602.50. Roxo never drilled a well on Baxsto's acreage or any other land as an operator. Roxo later sold the acquired minerals to another operator. Baxsto then learned that

3

Navigator had been paid an $11,000 bonus per acre. Baxsto claims Roxo's representations during their negotiations were false and made with the intent to induce Baxsto to "lock itself into" an unproductive lease and then later sell its mineral interests at a price lower than true market value. Baxsto asserted claims against Vortus and Roxo for fraud, fraudulent inducement, statutory fraud, and fraud by non-disclosure.

The trial court granted summary judgment for Roxo on all of Baxsto's claims. The court of appeals reversed. 668 S.W.3d 912, 922 (Tex. App.—Eastland 2023). It held that the parties' written agreements did not so directly contradict Roxo's alleged oral representations as to make Baxsto's reliance on the representations unjustifiable. *Id.* at 939. It further held there were insufficient red flags to put Baxsto on notice that it could not rely on Roxo's oral representations. *Id.* at 940.

The allegedly fraudulent representations fall into three categories: (1) Roxo's representations that it would not "flip" the lease but would instead make significant investments to develop it, (2) the size of the bonus amounts Roxo would pay to Baxsto relative to other mineral owners in the area, and (3) the promise to pay the bonus to Baxsto before recording the lease.

## II

Justifiable reliance is an element of each of Baxsto's fraud claims. *See Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015) (reciting elements of common-law fraud and fraudulent inducement); *see also Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*,

4

572 S.W.3d 213, 219-20 (Tex. 2019) (recognizing reliance element of fraud by non-disclosure). To prove justifiable reliance, Baxsto must show that (1) it actually relied on the defendant's representation, and (2) such reliance was justifiable. *See JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018). "[R]eliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law." *Id.* at 658 (internal quotation omitted).

A contract sufficiently contradicts an extra-contractual representation if the "meaning of [the] contract 'conflict[s] with the earlier representation such that a reasonable person could not read the agreement and still plausibly claim to believe the earlier representation.'" *Barrow-Shaver*, 590 S.W.3d at 498 (quoting *Orca Assets*, 546 S.W.3d at 658). The contract language need not explicitly contradict and correct the prior oral representation. *See id.* "[S]uch a requirement is simply too strict to be workable as it essentially requires the contract and extra-contractual representation to use precisely the same terms." *Id.* Thus, "even when the terminology appearing in the representation and the writing are not exactly the same," their substance may nevertheless be contradictory, such that reliance on the extra-contractual representation in the face of the contract language is not justifiable. *Id.*

## A

Baxsto claims Roxo made the following misleading statements regarding its intent to develop Baxsto's acreage rather than "flip" the lease:

- Roxo would drill and develop Baxsto's land.
- Roxo planned to make its money "at the bit."
- Roxo and Vortus were not in the business of leasing and flipping minerals to other operators.
- Vortus only invested in companies that drilled acreage.
- Vortus had committed $200-250 million to the project.

Essentially, Baxsto seeks to bind Roxo to its oral promise to drill on and develop the lease. Roxo points out, however, that the lease Baxsto signed contains no obligation to drill or develop the land. To the contrary, the lease contains a typical assignment provision, which allows "the interest of either Lessor or Lessee hereunder to be assigned, devised, or otherwise transferred in whole or in part."

Even if Roxo told Baxsto it would drill rather than "flip" the lease, both parties later signed an agreement giving Roxo an unqualified right to transfer the lease rather than drill. This unqualified transfer right, clearly expressed in writing and agreed to by Baxsto, directly contradicts the notion that Roxo bound itself orally not to transfer the lease and instead to drill. We confronted a similar circumstance in *Barrow-Shaver*. There, the plaintiff complained that the lessor refused to consent to an assignment after orally promising never to withhold its consent. 590 S.W.3d at 476. The parties' written agreement, however, gave the lessor the right to give or withhold consent. *Id.* at 477. We held that the unqualified consent-right stated in the contract made it

6

unjustifiable for the plaintiff to rely on a prior oral promise that consent would be given.  *Id.* at 499-500.  The same reasoning holds true here. Just as an unqualified contractual right to withhold consent contradicts a prior oral promise to give consent, an unqualified contractual right to transfer a lease contradicts a prior oral promise not to do so.

Baxsto complains that Roxo falsely represented itself as "in the business" of developing land rather than flipping leases.  The court of appeals considered this representation actionable despite the written agreement.  668 S.W.3d at 938.  We disagree.  Whatever Roxo said about being "in the business" of developing land, Baxsto freely agreed to a written agreement that allows Roxo, at its election, to no longer be "in the business" of developing Baxsto's land.

The kinds of obligations to which Baxsto claims Roxo orally bound itself are addressed, often in multiple ways, by nearly every oil and gas lease, including this one.  An obligation not to transfer the lease can of course be written into the lease, and Baxsto could have refused to agree in writing to a transfer clause at odds with Roxo's oral promises.  It did not.  Baxsto also could have insisted on a habendum clause imposing a timely drilling obligation on Roxo.  It did not.  *See Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554-55 (Tex. 2002) (recognizing that most habendum clauses implicitly recognize that no drilling or development is necessary for the lessee to maintain the lease during the primary term).  Even more to the point, under this "paid-up" lease, the lessee's right not to drill for a time had already been purchased.  *See ConocoPhillips*, 547 S.W.3d at 874 (discussing "paid-up" leases).

7

Thus, in multiple ways, the lease Baxsto signed is inconsistent with the oral deal it claims to have made. Having signed such an agreement, Baxsto cannot now hold Roxo to whatever version of the deal the parties may have previously discussed orally. All of Baxsto's claims premised on Roxo's alleged promises to develop the acreage rather than "flip" it fail for lack of justifiable reliance.

**B**

Baxsto also complains about Roxo's representations regarding bonus payments. The alleged misrepresentations are:

- Roxo reduced its bonus offer to Navigator to $3,500 per acre.
- Roxo would not pay Navigator a higher bonus than $5,000 per acre.
- Baxsto's bonus was the highest that would be given to any of the area's owners.
- Roxo's purchase offer was a "great deal" because Baxsto had already received the highest bonus, and Navigator was currently being offered a lower bonus.

The only mention of these matters in the parties' written agreements is a "most favored nations" clause in the agreements extending Roxo's lease purchase option. This clause provided that for the following six months, if Roxo paid a larger bonus to a qualifying lessor, Baxsto would get the same amount. Baxsto does not allege that Roxo breached this clause. Instead, it alleges that Roxo's misrepresentations about how Baxsto's bonus compared to Navigator's bonus induced Baxsto to agree to a less favorable deal.

To determine whether Baxsto justifiably relied on those alleged misrepresentations, we first observe that none of them made it into the parties' agreements. *See Barrow-Shaver*, 590 S.W.3d at 496-97. The

8

agreements provide for a fixed bonus payment of $5,000 per acre, which was paid. As for any connection between Baxsto's bonus payments and those of comparable parties, the only thing that ever achieved the written consent of both parties is a single "most favored nations" clause containing a six-month expiration date. There is no remaining allegation that this clause was breached. Indeed, its presence in the parties' agreements indicates that Baxsto understood how to negotiate for matching treatment to be guaranteed in writing when it desired to do so.

As in *Barrow-Shaver*, the absence from the written agreements of language confirming the alleged representations or cementing the parties' alleged oral agreement is itself a red flag negating justifiable reliance. *Id.* at 501. When a party like Roxo proffers written contract language that makes no mention of matters the parties have previously discussed, this alone should make it obvious to a reasonably sophisticated party like Baxsto that the previous discussions may no longer be part of the deal. The prudent response is to demand that the parties' discussions be reflected in the writing—not to sign an agreement that makes no mention of the promises and then try to hold your counterparty to them anyway.

When assessing red flags, we view "the circumstances in their entirety while accounting for the parties' relative levels of sophistication." *Orca Assets*, 546 S.W.3d at 656. Assuming the truth of Baxsto's allegation that Roxo was the more sophisticated party, the unrebutted summary-judgment evidence nevertheless shows that Baxsto's representative, Cole Stout, was an experienced oil and gas

businessman who should have appreciated the significance of the disparities between the signed agreement and the alleged oral promises now claimed. In the two years before the parties began negotiations, Stout negotiated at least fifty oil and gas leases. This deal alone involved 548 mineral acres, 6,200 physical acres, and $8 million. The parties executed numerous written agreements, including the lease, the extensions, and the sale contract. As in *Barrow-Shaver*, "[a] similarly situated 'savvy participant' would have recognized that [Defendant] could change its mind, if [the] representations were binding at all, and would have weighed the risk of that happening before entering into the agreement." 590 S.W.3d at 501.

Whether or not Stout was as sophisticated a negotiator as Roxo, he was in a position to intelligently assess the merits of the $8 million deal he was making, and he was in a position to understand the differences between the deal he was signing and any prior discussions not contained in the documents he signed. He was also in a position to seek and obtain information other than Roxo's self-serving statements when assessing the value of Baxsto's mineral interests. Baxsto's reliance on Roxo's alleged misrepresentations about bonus payments was unjustifiable as a matter of law, and the trial court correctly granted summary judgment in this regard.

## C

We next address Baxsto's claim that Roxo fraudulently failed to disclose that it had recorded the lease too early, in violation of the parties' agreement that the lease would not be recorded until the bonus was paid. Fraud by non-disclosure arises only when the defendant,

10

among other things, has a legal duty to disclose facts to the plaintiff. *See Bombardier Aerospace Corp.*, 572 S.W.3d at 219-20 (reciting elements). Generally, no duty of disclosure arises "without evidence of a confidential or fiduciary relationship." *Id.* at 220. Whether there is a duty to speak is a question of law. *In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 678 (Tex. 2009).

Roxo and Baxsto were counterparties in a business deal, not aligned parties in a confidential or fiduciary relationship. Thus, Roxo had no legal duty to report to Baxsto that it had prematurely recorded the lease, and nothing in the summary-judgment record indicates that any such duty arose. The contents of deed records are public, and recorded instruments put all parties on constructive notice of their contents. *HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 886-87 (Tex. 1998). Had Baxsto been concerned at the time with whether the lease had been prematurely recorded, it could have searched the deed records rather than relying on Roxo to keep it updated on their contents. Summary judgment on this aspect of Baxsto's fraud claim was proper.

Finally, Baxsto claims that Roxo's promise not to record the lease until after paying the bonus was knowingly false when made. As Baxsto sees it, this fraudulent promise was made as part of a scheme to induce it into ultimately selling its minerals to Roxo at an artificially low price. Such a claim requires, among other things, proof that the defendant knew the representation was false when made and intended to induce the plaintiff's detrimental reliance on it. *Orca Assets*, 546 S.W.3d at 653; *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001).

11

Baxsto has adduced no evidence that Roxo intended, by its statements about the timing of the lease recordation, to induce the ultimate sale of Baxsto's minerals. A promise not to record the *lease* is highly attenuated from the supposed object of the inducement—*the sale*—which did not happen for several more months. None of the evidence connects Roxo's statements about when it would record the lease to Baxsto's ultimate decision to sell its mineral interests, a decision Baxsto freely made and that Roxo could not force it to make. Nothing but Baxsto's suspicion and conjecture supports the notion that the timing of Roxo's recordation of the lease was a key part of a fraudulent plot to "force" Baxsto to sell its minerals. Summary judgment on this tenuous and vague theory of liability was proper.

## III

For the foregoing reasons, without hearing oral argument, we grant the petition for review, reverse the court of appeals' judgment, and reinstate the district court's judgment. *See* TEX. R. APP. P. 59.1.

**OPINION DELIVERED:** May 9, 2025